# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABDELILLAH ELHASSANI,<br><br>　　　　　　　Petitioner,<br><br>v.<br><br>UNITED STATES CITIZENSHIP AND<br>IMMIGRATION SERVICES,<br><br>　　　　　　　Respondent. | Case No.:  33:20-cv-02159-BEN-AHG<br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW AND<br>ORDER:**<br>**(1) DENYING-IN-PART AND<br>　　GRANTING-IN-PART<br>　　REQUESTS FOR JUDCIAL<br>　　NOTICE; and**<br><br>**(2) DENYING AS MOOT<br>　　PETITIONER'S REQUEST FOR<br>　　AN EXTENSION**<br><br>**[ECF No. 17, 18, 19, 22, 23, and 28]** |

## I.　　<u>INTRODUCTION</u>

Petitioner Abdelillah Elhassani ("Petitioner" or "Mr. Elhassani") brings this action seeking (1) *de novo* review of the decision of Respondent United States Citizenship and Immigration Services ("Respondent" or "USCIS") denying his application for naturalization as a United States citizen and (2) a hearing *de novo* on that application, under 8 U.S.C. § 1421(c).  ECF No. 1 at 1,[1] ¶ 1.  Also before the Court are Petitioner's Request

---

[1]　　Unless otherwise indicated, all page number references are to the ECF-generated

for Judicial Notice, ECF No. 18; Respondent's Request for Judicial Notice, ECF No. 22; and Petitioner's Unopposed Motion to Extend the Deadline for Submission of the Parties' Proposed Findings of Fact and Conclusions of Law, ECF No. 28.

Petitioner's Unopposed Motion to Extend the Deadline for Submission of the Parties' Proposed Findings of Fact and Conclusions of Law is **DENIED** as moot given Petitioner timely submitted his Proposed Findings of Fact before the Court was able to rule on the Motion for the Extension. *See*, *e.g.*, *Tur v. YouTube, Inc.*, 562 F.3d 1212, 1214 (9th Cir. 2009) ("we conclude that an issue is moot when deciding it would have no effect within the confines of the case itself"). After considering the papers submitted, supporting documentation, and applicable law, the Court (1) **DENIES-IN-PART** and **GRANTS-IN-PART** the parties' requests for judicial notice and (2) **DENIES** Petitioner's request that the Court grant him naturalization and administer the oath of allegiance.

## II.   BACKGROUND

USCIS denied Petitioner's application on the ground that he (1) was affiliated with ISIS[2] and (2) intentionally lied to obtain an immigration benefit, thereby precluding him from establishing his good moral character. Compl. at 2, ¶ 3. Petitioner claims that he is not a terrorist; strongly denounces both ISIS and terrorism in general; "considers himself to be living the American dream, and he is attached to the principles of the U.S. Constitution." *Id.* at 2, ¶ 4. He argues that "[h]is brothers' actions are not a basis to deny Mr. Elhassani naturalization." *Id.*

---

page number contained in the header of each ECF-filed document. This includes any references to the Certified Administrative Record, ECF No. 13 ("CAR"), which contains three sets of page numbers: two sets on the bottom right-hand corner of most pages and the ECF-generated header. Although the parties referred to one of the two numbers on the bottom right-hand corner in their briefing, to avoid confusion (given the duplicate page numbers), the Court refers to the page numbers in the header.

[2]   The acronym "ISIS" refers to "The Islamic State of Iraq and Syria," which is a foreign terrorist organization. *Gonzalez v. Google LLC*, 2 F.4th 871, 880-82 n.1 (9th Cir. 2021). Occasionally, ISIS is also referred to as "The Islamic State of Iraq and the Levant." *Id.* Both names are derived from the Arabic "ad-Dawlah al-Islamiyah fil-'Iraq wash-Sham." *Id.*

A.   <u>**Findings of Fact**</u>

Petitioner is a 39-year-old native and citizen of Morocco and a lawful permanent resident of the United States (the "U.S."). Respondent's Proposed Findings and Conclusions of Law, ECF No. 29 ("RFFCL") at 12:11-12; Petitioner's Proposed Findings and Conclusions of Law, ECF No. 30 ("PFFCL") at 2:5-6. His wife, Armelina Elhassani ("Armelina"), and three children are U.S. citizens, and Petitioner, who has resided here for more than twenty (20) years, has been seeking U.S. citizenship for the past five (5) years. Complaint, ECF No. 1 ("Compl.") at ¶ 2, 10, ¶ 33.

Petitioner has five brothers and one sister. CAR, Record of Sworn Statement, ECF No. 13-3 ("Transcript I") at 41; Transcript of August 30, 2021 Trial, ECF No. 27 ("TT") at 21:14-15. In terms of birth order, Salaheddine Elhassani ("Salaheddine") is the first born; Petitioner is second; Moussa Elhassani ("Moussa") is third; Abdelhadi Elhassani ("Abdelhadi") is fourth; Abdalfattah Elhassani is fifth; Yassine Elhassini ("Yassine") is the sixth son; and Fatima is the youngest and seventh child as well as the only daughter. Statement at 41-42; *see also* CAR, ECF No. 13-1 at 40-41; TT at 21:16-22:3, 24:18-19, 33:21-22.

Moussa married Samantha Elhassani ("Samantha"). Transcript I at 42; ECF No. 14 at 55; TT at 21:16-22:3, 24:18-19, 33:21-22. Petitioner states that while he was close to Moussa when they grew up, once they lived in different states, they were not very close, and at the time of his September 10, 2018 naturalization interview, they "had not spoken for three or four years." *Id.* at 41.

1.   <u>*Initial Admission on Student Visa and Education*</u>

In July 1999, Petitioner was admitted into the U.S. on a F-1 student visa to attend North Dakota State University to study computer science. JCMS at 2:1-2; TT at 13:3-8; PFFCL at 2:7-8. While Petitioner was attending North Dakota State University, Moussa also attended school there for one year, but then, he moved away. Transcript I at 41. Petitioner has testified that Moussa has struggled with addiction throughout his life and often disappeared for months at a time. Transcript of October 30, 2019 Interview, ECF

No. 24 ("Transcript II") at 5, 14:3-14.

In 2003, Petitioner graduated with a bachelor's degree in Computer Science.  JCMS at 2:1-2; *see also* Transcript I at 40.  From 2003 to 2005, Petitioner was enrolled in a master's degree program in software engineering at San Jose State University.  Compl. at 10, ¶ 34; *see also* Transcript I at 40.  However, he never finished this degree because in 2005, he started working for a start-up in Silicon Valley.  Transcript I at 40.

### 2.   *Adjustment to Conditional Permanent Resident*

On November 16, 2004, or over seventeen years ago, Petitioner adjusted his status to conditional permanent resident of the U.S., based on marriage to his U.S. citizen wife. JCMS at 2:3-4; RFFCL at 12:13-14; TT at 13:14-15; PFFCL at 2:9-15.  During his period of conditional status, Petitioner was convicted of two felonies,[3] which he disclosed to USCIS while also providing documentation of the convictions.  JCMS at 2:4-5.

a.   *Felony Conviction for Use of Personal Identifying Information*

---

[3]   An applicant for naturalization must prove good moral character "for a period of at least five years after having been lawfully admitted for permanent residence."  *See* 8 C.F.R. §§ 316.2(a)(3), (7), 316.10(a).  "An applicant who has committed or admits the commission of two or more crimes involving *moral turpitude* during the statutory period is precluded from establishing good moral character, even though the conviction record of one such offense has been expunged."  8 C.F.R. § 316.10(c)(3)(ii) (emphasis added).

Here, Petitioner's felony convictions do not preclude the Court from finding good moral character.  The crimes fall outside the statutory period because they took place in 2006 and 2007, over eight years before Petitioner filed his Application for Naturalization on November 27, 2015.  *See* Compl. at 5, ¶ 11, 11, ¶ 36; *see also Khamooshpour v. Holder*, 781 F. Supp. 2d 888, 893 (D. Ariz. 2011) ("The only contested issue here is Mr. Khamooshpour's ability to demonstrate his good moral character for the relevant statutory period, which runs from the five years immediately preceding the filing of his naturalization application until the oath of allegiance is administered") (citing 8 C.F.R. § 316.10(a)(1); *United States v. Dang,* 488 F.3d 1135, 1139 (9th Cir. 2007)).  However, the Court may still consider the crimes, but they do not preclude a finding of good moral character as a matter of law.  *See id.* at 893-94 ("The Court must make a determination regarding the applicant's moral character during the statutory period, but it "may take into consideration, as a basis for its determination, the applicant's conduct and acts at any time prior to [the statutory period].") (citing 8 C.F.R. § 316.10(a)(2)).

On July 16, 2005, Petitioner used the personal identifying information, including the social security number, of Tarik Benhiba, without his permission to open a PayPal/eBay account in Mr. Benhiba's name.  RFFCL at 12:15-18.  Petitioner testified that he had to use his roommate's identification to open the PayPal account because his own account had been suspended "for some reason" that he still does not "know to this day."  TT at 18:17-19:5.  He stated that when the new account he opened in Benhiba's name was closed, he was no longer able to add money to it, which resulted in a negative balance in the account.[4]  *Id.* at 20:3-8.

On April 21, 2006, Petitioner was convicted of using personal identifying information under California Penal Code § 530.5(a), a felony.[5]  JCMS at 2:6-8; *see also* CAR, ECF No. 13-1 at 89; RFFCL at 12:18-20; PFFCL at 2:16-20.  He was placed on formal probation for three years, sentenced to 60 days in jail, and ordered to pay restitution.  Compl. at 14, ¶ 54.  Petitioner only served two days in jail.  TT at 19:8-9.

### b.    *Felony Conviction for Grand Theft*

On November 8, 2006, while he was still on probation for his 2006 conviction, Petitioner was accused of stealing more than four hundred dollars from Rougier Arnaud.  RFFCL at 12:21-22.  At trial, he testified that he was selling electronics and had "several hundreds, probably a couple of thousands of customers," and "at some point, … had issues with inventory" causing him to be unable to deliver merchandise on time, even though he

---

[4]    He suspects the negative balance arose because a customer may have disputed a shipment that arrived late, which would have resulted in money in the account being transferred to the customer for a refund.  TT at 20:3-8.  Petitioner testified that while he was ordered to pay restitution to PayPal and eBay for the negative account balance but was not ordered to pay any restitution to Mr. Benhiba because he did not "take any money from him."  *Id.* at 19:10-16.

[5]    This crime does not categorically qualify as crime of moral turpitude and is outside the statutory period.  *See, e.g.*, *Linares-Gonzalez v. Lynch*, 823 F.3d 508, 516, 519 (9th Cir. 2016) (holding that "[g]iven . . . no fraudulent intent is required and the fact that a person may violate CPC §§ 530.5(a) . . . . without obtaining any tangible benefit, we reject the government's argument that violations of these subsections are categorical fraud-based CIMTs)").

received money for the merchandise.  TT at 20:11-17.

On April 13, 2007, Petitioner was convicted of grand theft under California Penal Code § 484/487(a), a felony, in connection with a customer's order that never arrived.[6] JCMS at 2:8-10; PFFCL at 2:21-23.  He was placed on probation for three years, sentenced to six months in jail, and ordered to pay restitution.  Compl. at 14-15, ¶ 54.  He served fourteen days in jail.  TT at 20:18-19.

### 3. _Adjustment to Lawful Permanent Resident_

On May 2, 2007, despite his felony convictions, Petitioner and his wife successfully removed the condition on his residence on or about May 2, 2007.  JCMS at 2:11; RFFCL at 12:26-27.  They remain married and have three U.S. citizen children together, ages 10, 9, and 2.  PFFCL at 2:11-13.

On April 26, 2012, Petitioner's two felony convictions were reduced to misdemeanors and expunged pursuant to California Penal Code § 1203.4.  JCMS at 2:12-13; PFFCL at 2:24-26; RFFCL at 13:1-3.

### 4. _Petitioner's Involvement with Global Warehousing Group, LLC and World Logistics Solutions, LLC_

On October 13, 2011, articles of organization were filed for World Logistics Solutions, LLC, an Indiana limited liability company ("WLS"), which listed its principal place of business as 55335 Corwin Rd., Ste. A, Elkhart, Indiana 46514, and its managing member as Armelina.[7]  _See_ PFFCL at 6:6-15.  Petitioner describes WLS as "a packaging

---

[6]     "[T]he federal generic definition of a CIMT [crime involving moral turpitude] is a crime involving fraud or conduct that 1) is vile, base, or depraved and 2) violates accepted moral standards."  _Linares-Gonzalez v. Lynch_, 823 F.3d 508, 514 (9th Cir. 2016).  The Ninth Circuit has "consistently held that a conviction under CPC § 484(a) is for a CIMT."  _Silva v. Garland_, 993 F.3d 705, 716 (9th Cir. 2021).

[7]     The Court takes judicial notice, _sua sponte_, of the relevant Indiana Secretary of State filings, publicly accessible at https://bsd.sos.in.gov/PublicBusinessSearch, for the corporations discussed.  _See, e.g._, Fed. R. Evid. 201(c)(1) (allowing courts to take judicial notice _sua sponte_); _see also Indian Hills Holdings, LLC v. Frye_, 337 F.R.D. 293, 300 n.4 (S.D. Cal. 2020) (Benitez, J.) (taking judicial notice, _sua sponte_, of records from the California Secretary of State website).

and consolidation service." Transcript I at 40; *see also TT* at 14:25-15:3. He elaborated that WLS has "hundreds [of] thousands of customers overseas," who cannot purchase items from U.S. retailers, like Macy's or Wal-Mart, because those retailers will not ship outside the U.S. TT at 15:11-16:7. WLS allows those customers to purchase items from those U.S. retailers by providing WLS' address as the shipping address. *Id.* Once the items for that customer arrive at WLS, they are consolidated into fewer boxes to save on shipping costs and forwarded to the customer's home country via Fed-Ex, UPS, or DHL. *Id.*

On December 28, 2011, articles of organization were filed for Global Warehousing Group, LLC, an Indiana limited liability company ("GWG"), which listed its principal place of business as 2421 S. Nappanee St., Gate 7, Elkhart, IN 46517, and its managing member as Aremelina. PFFCL at 6:6-15. Petitioner describes GWG as "an on-demand storage company." Transcript I at 40. While Armelina was the owner of GWG, Petitioner managed its websites and served as GWG's manager. *Id.* Not only did GWG own the warehouse in Elkhart, Indiana where WLS operated, CAR, Declaration of Applicant, ECF No. 13-2 ("Applicant Decl.") at 148, ¶ 31, but GWG would also liquidate abandoned WLS merchandise. TT at 25:20-26:20. For example, if a WLS customer shipped items to the WLS warehouse but failed to pay shipping fees within 180 days, then, WLS would treat the items as abandoned, move the items to GWG's warehouse, and list and sell those items on eBay and Amazon. *Id.*; *see also* PFFCL at 6:24-7:2.

Petitioner advises that GWG unofficially did business as Atlasmart, which was the name of GWG's online stores for Amazon and eBay, where it would sell WLS' abandoned items. TT at 9:11-19; *see also* CAR, ECF No. 13-2 at 154-58 (showing Atlasmart's Amazon and eBay seller profiles); PFFCL at 6:24-7:2. GWG sales proceeds from Amazon and eBay were deposited directly into a Bank of America account that Petitioner and Armelina jointly held. Applicant Decl. at 148, ¶ 33.

Sometime on or before 2014 through Spring 2015, and because Petitioner and his wife lived 2,100 miles away from WLS and GWG, Moussa started working for WLS in Indiana as an independent contractor. *See* CAR, ECF No. 13-2 at 212 (showing Moussa's

2014 1099-MISC for WLS); *see also* PFFCL at 6:6-23. Petitioner states that he and his wife "let him work for us because he was related to us." Transcript I at 41; PFFCL at 6:19-21. However, he elaborates that even though WLS issued Moussa's 1099-MISC, the work Moussa performed around the warehouse that the two companies shared was actually for GWG. *See* Applicant Decl. at 148, ¶ 35. This work included "doing work around the warehouse and shoveling snow with a truck." E Transcript I at 41. He also broke pallets, put pallets together, pulled boxes, put boxes together, brought overstocked items from one warehouse to another, and arranged for them to be listed on eBay and Amazon to sell. Transcript II at 7, 21:12-22:11.

Samantha also worked for GWG for approximately one year. Transcript I at 41. Because they were independent contractors, Petitioner would pay Moussa and Samantha via bank transfers from the joint bank account where Atlasmart sales proceeds were deposited "for their work at the warehouse." *Id.* at 42-43. As an independent contractor, Moussa had no fixed start and end time for his work day and would not clock in or calculate his hours. Transcript II at 6:1-24. Instead, each quarter (*i.e.*, payments would be made in early April, July, September, and December), as his earnings for helping with the business, Moussa would receive a 30% share after deducting shipping expenses and other independent contractor expenses from the joint account, which contained the proceeds from sales of the liquidated items. Applicant Decl. at 148, ¶ 33; *see also* PFFCL at 7:3-7. Because of the nature of his employment (*i.e.*, being an independent contractor) along with the fact that Petitioner and his wife lived in California while Moussa worked at the warehouse in Indiana, Petitioner had no way of knowing if Moussa failed to show up for work for a week or two. Transcript II at 6, 17:1-24.

On February 10, 2015, WLS was administratively dissolved. Shortly thereafter, on April 16, 2015, GWG was administratively dissolved.

On June 29, 2015, WLS registered to start business in Portland, Oregon, listing its principal place of business as 11923 NE Sumner St., Portland, Oregon 97220. *See* Applicant Decl. at 148, ¶ 30; *see also* http://egov.sos.state.or.us/br/pkg_web_name_srch_

inq.show_detl?p_be_rsn=1772019&p_srce=BR_INQ&p_print=FALSE.  Petitioner stated that the reason for closing GWG and moving WLS to Oregon was that he and Armelina did not see GWG growing.  Transcript I at 40.  They wanted to focus on growing WLS because it had more growth potential and moved it Portland, Oregon for tax reasons.  *Id.*

### 5.   *Moussa, Samantha, and Abdelhadi's Departure from the U.S.*

In late November 2014, while Moussa was working for GWG, "ISIS had been designated by the United States as a foreign terrorist organization and had become a household name, in large part due to the beheadings of journalist James Foley and other Westerners by ISIS member 'Jihadi John' that went viral on the internet in the summer of 2014."  *See* Government's Sentencing Memorandum, ECF No. 23 in *United States v. Samantha Elhassani*, Case No. 19-cr-00159-PPS-JEM, 2020 WL 7232419 (N.D. Ind. Aug. 17, 2020).[8]

Sometime in November 2014, Abdelhadi and Moussa met in Indiana, and according to Samantha, "Abdelhadi[, who] was far more radicalized than Moussa … ultimately

---

[8]   As noted, the court "[m]ay take judicial notice on its own," or *sua sponte*, FED. R. EVID. 201(c)(1), including of court records on the docket, *see*, *e.g.*, *Rand v. Rowland*, 154 F.3d 952, 961 (9th Cir. 1998) (noting that "[f]or example, judicial notice by the district court of its own records, either at the behest of the defendant or *sua sponte,* may disclose that the plaintiff had recently been served . . ."); *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) (providing that "a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases").  Thus, the Court takes judicial notice of the proceedings against Samantha Elhassani, which were referenced in Plaintiff's Complaint.  *See* Compl. at 14, ¶ 53.

The Court notes that there were two federal prosecutions against Samantha: *United States v. Samantha Elhassani*, Case No. 18-cr-00033, which the Court will refer to as *Elhassani I*, and *United States v. Samantha Elhassani*, Case No. 19-cr-00159-PPS-JEM, which the Court will refer to as *Elhassani II*.  As the Court noted at the hearing in this matter, these facts are not admitted as evidence that Petitioner knew any of these facts on or before his September 10, 2018 interview.  TT at 80:6-81:6 (sustaining Petitioner's objection to the Court taking judicial notice of facts discussed in Samantha's prosecution as evidence of what Petitioner knew).  Rather, they provide context to the events relevant to this case, and as stated, were referenced by Plaintiff in his complaint.  Compl. at 14, ¶ 53.

swayed his brother to follow him to Syria, beginning most likely in November 2014 when they met in Indiana."  Defendant's Response to Government's Sentencing Memorandum, *Elhassani II*, 2020 WL 7230627 (N.D. Ind. Sept. 4, 2020).  On Thanksgiving weekend of 2014, Moussa introduced the idea of wanting to join ISIS to his wife.  *Id.*  However, there is no evidence in the record that Moussa ever expressed his feelings to Petitioner, and Petitioner denies any knowledge of Moussa's plans.  In fact, the Government has admitted in the subsequent case brought against Samantha relating to aiding and abetting ISIS that it has "little or no documentation of Moussa's support of ISIS's ideology or the Caliphate before they moved to Syria."  *Elhassani II*, 2020 WL 7230627 (citing the Government's Sentencing Memorandum in the same case, ECF No. 23 at 12, n.5).  Abdelhadi, on the other hand, was "[t]he only member of the conspiracy who openly discussed his support for ISIS before traveling to Syria."  *Id.*; *see also* Government's Sentencing Memorandum in *Elhassani II*, 2020 WL 7232419.

Between November 2014 and February 2015, Moussa and Samantha "had already begun drawing down the savings in their bank accounts."  *See Elhassani II*, 2020 WL 7232419.  On February 17, 2015, Samantha went alone to Hong Kong, taking their cash and gold bought with those savings to Hong Kong, China.[9]  *Id.*  Financial records show that Moussa and Samantha "bought roughly $97,000 in gold and precious metals from November 2014 through the time they [later] crossed into Syria."  *Id.*

On March 7, 2015, seemingly out of nowhere,[10] Petitioner sent Abdelhadi an e-mail with the subject "DO NOT send me any more messages about …," in which the body of the e-mail stated, "From now own, please DO NOT include my email address in any message regarding ISIS, the group, the Sunna, the Shi'a, etc. … I don't have time to waste on that stuff."  CAR, ECF No. 13-3 at 9.  Five others were copied on this e-mail, including

---

[9]     "Unlike Turkey, Hong Kong was not a common staging point for Westerners to travel through en route to joining ISIS and thus less likely to arouse suspicion."  *Elhassani II*, 2020 WL 7232419.

[10]     Because the subject line does not contain "Re:" or "Fwd:" in front of it, this e-mail appears to be unprovoked and not in response to any particular e-mail.

Moussa and Yassine.  *Id.*  Petitioner has reiterated many times that Abdelhadi was a chronic e-mail forwarder, who frequently sent e-mails to the family regarding various topics.[11]  PFFCL at 12:15-21.  Petitioner states that if Abdelhadi sent additional e-mails regarding religion after his March 7, 2015 e-mail, he would not have seen them because he set up a filter to forward Abdelhadi's e-mails to his junk mail folder.  *Id.*

On March 16, 2015, approximately one month after Samantha's trip to Hong Kong, Samantha and one of her children went on a one-day, round-trip visit to Hong Kong to deposit more of the couple's savings.  *See Elhassani II*, 2020 WL 7232419.  On March 19, 2015, Samantha even "lied to FBI agents with whom she previously worked as a confidential human source that she was traveling to Morocco for three months for knee surgery to be performed by her father-in-law (who was actually an engineer) and had not yet made travel plans."  *Id.*  "In fact, her final trip to Hong Kong was booked almost two weeks before her meeting with the FBI."  *Id.*

"With the money safely abroad in an inconspicuous location, Abeldhadi and Moussa would be able to leave the United States without carrying large sums of money and precious metals."  *See Elhassani II*, 2020 WL 7232419.  In Samantha's prosecution, the government acknowledged that "the Elhassani family travel plans were done in secret."  *Id.*  "In the months leading up to their final departure, [Samantha] told coworkers, including close friend Cassie Daniels, that she and her family were taking an extended vacation to Morocco."  *Id.*  Samantha admitted that she helped Moussa and Abdelhadi join ISIS by making a total of three trips abroad to Hong Kong between November 2014 and April

---

[11]     The record confirms that on February 10, March 23, April 4, and April 23, 2014, Abdelhadi sent e-mails to various members of his family—sometimes, copying as many as eight family members—regarding everything from how Facebook generates its ad revenue to the impact of genetically modified organisms ("GMOs") on children.  *See* CAR, ECF No. 13-2 at 215-21.  On May 18, 2014, Abdelhadi sent Mohamed, Salaheddine, Petitioner, Fattah, Yassine, and Zahra an e-mail entitled "Two Worlds, world of khal9 (creation) and world of amr(command)," which appeared to discuss religious issues.  *Id.* at 219-21.  Yet, almost one month later, on June 14, 2014, Abdelhadi sent Petitioner, Moussa, Fattah, and Yassine an e-mail about watching World Cup games.  *Id.* at 214.

2015.  Plea Agreement, *Elhassani II*, 2019 WL 11318372 (N.D. Ind. Nov. 25, 2019).
During the first two trips, she transported more than $30,000 in cash and gold from the
United States and deposited these items in a safe deposit box in Hong Kong.  *Id.*

Later in March 2015, Moussa and Abdelhadi departed their respective homes in
Indiana and Minnesota to leave the U.S. and join ISIS.  CAR, USCIS April 4, 2019
Decision, ECF No. 13-2 ("Decision") at 83; *see also* PFFCL at 7:27-8:2; RFFCL at 13:5-
8.  First, on March 22, 2015, Moussa and Samantha departed the U.S. at the Chicago
O'Hare International Airport aboard American Airlines Flight 187 and arrived in Hong
Kong on March 23, 2015.  *Id.*; *see also* PFFCL at 7:27-8:2; RFFCL at 13:5-8.  Next, on
March 29, 2015, Abdelhadi departed the U.S. from Chicago aboard American Airlines
Flight 185 for Hong Kong.  *Id.*; RFFCL at 13:5-8.

Petitioner alleges he did not know when Moussa departed the U.S. as Moussa was
living in Indiana and never said goodbye or told him about his plans.  Compl. at 3, ¶ 6.

### 6.    *Post-Departure E-mails between Petitioner and His Brothers*

As of April 2015, GWG dba Atlasmart owed Moussa for its November 2014 through
March 2015 sales.  PFFCL at 7:8-11.  Accordingly, on April 5, 2015, after Moussa and
Abdelhadi had departed the U.S., Moussa e-mailed Mr. Elhassani the following message:
"[C]an you please do atlasmart accounting asap.  I have to pay several bills including
phone.  Please do a transfer to my bank of america acct."  CAR, ECF No. 13-3 at 15-16;
*see also* RFFCL at 13:9-10.  While Moussa sent this e-mail two days before he and
Samantha were leaving Hong Kong for Turkey, the record contains no evidence to indicate
that at the time of this e-mail, Petitioner knew Moussa and/or Abdelhadi had left the U.S.,
much less joined ISIS.  *See generally* CAR.

On April 6, 2015, at 12:24 a.m., Petitioner responded, "Got it.  I'm working on it
now."  CAR, ECF No. 13-3 at 16.  That same day, at 4:21 p.m., he responded again:

> I just sent you $1000 now to help with your urgent bills, on top
> of the $2000 previously paid in advance.  I will finish the rest of
> accounting tomorrow and transfer the remaining amount.

> BTW, Amazon account was suspended because of high defects rate, Yassine is working on getting it restored but he **may need your help**.

*Id.* at 16 (emphasis added); RFFCL at 13:14-15.  Moussa replied to this e-mail with:

> plz plz try to finish it today.  Allah ketter min khayrekh!
>
> I am helping as much as possible.  We are only selling on Amazon low ticket items that are very simple to fulfill and no one wants to returns.  The rest is sold on eBay.  The account is not suspended anymore.  We appealed it.
>
> Nicole and Zahra are doing great.  Mohamed Yassine is helping a lot.
>
> Please don't include Atlasmart income after March 23rd.  I haven't helped with orders but I did bring 3 pallets of items to the small warehouse. That should keep them listing for a month inchallah.
>
> Plz don't forget to finish accounting today
> Thank you

CAR, ECF No. 13-3 at 16; RFFCL at 13:10-13.

On that same day, Petitioner did, in fact, transfer $1,000.00 to Moussa's checking account.  *See* CAR, ECF No. 13-2 at 185; *see also* PFFCL at 9:7-8.  By doing so, whether he knew it or not, Petitioner unquestionably provided funds to someone planning on joining—or someone who had already joined—a terrorist organization.

On April 7, 2015, Samantha, Moussa, their children, and Abdelhadi left Hong Kong for Turkey.  *See Elhassani II*, 2020 WL 7232419; *see also* RFFCL at 22:11-5 (stating that they flew to Istanbul, Turkey, and then, traveled to Sanliurfa, Turkey, near the Syrian border).  On April 10, 2015, at 9:28 a.m., Petitioner e-mailed Moussa a breakdown of what he was owed for November and December 2014.  CAR, ECF No. 13-2 at 204-209.  This accounting breakdown showed a total income of $5,187.89, which is backed up by actual profits from Amazon sales ($9,799.36) with deductions for expenses ($1,099.70) and employee pay ($3,511.87), leaving Moussa entitled to 30% (or $1,556.34) and Yassine entitled to 20% ($1,037.59).  *Id.* at 204-207; PFFCL at 7:11-14.  Because Moussa had

-13-

received a $1,000.00 advance, he was only entitled to a remainder of $99.70 for November and December 2014 income.  *See* CAR, ECF No. 13-2 at 185.   However, later that day, Petitioner also e-mailed Moussa the accounting breakdown for the first quarter of 2015 (*i.e.*, January, February, and March 2015), which showed Amazon and eBay gross profits of $31,664.15, with deductions of $3,572.92 for expenses and $2,829.01 for employee pay, resulting in total income of $25,262.22, with Moussa entitled to 30% ($7,578.67) and Yassine entitled to 20% ($5,052.44).  *Id.* at 208-209; *see also* PFFCL at 7:15-18.

On April 11, 2015, Moussa responded to Petitioner with "please do the transfer to boa; I need it urgently."  CAR, ECF No. 13-3 at 3.  On April 12, 2015, Petitioner responded with the following accounting reconciliation:

| Atlasmart Quarter: | Income Owed to Moussa: |
|---|---|
| **November, December 2014 Q4 Income:** | $1,556.34 |
| **January, February, and March 2015 Q1 Income:** | $7,578.67 |
| **TOTAL:** | **$9,135.01** |
| **Advances Already Paid:** | |
| **February 16, 2015:** | ($2,000.00) |
| **April 6, 2015:** | ($1,000.00) |
| **Remainder to be Transferred:** | **$6,135.01** |

CAR, ECF No. 13-3 at 13-14; *see also* PFFCL at 7:19-22; RFFCL at 13:18-20.  Petitioner stated in the same e-mail that he would transfer $4,135.01 that day, leaving a remaining $2,000.00 balance that he would transfer on Monday.  *See* CAR, ECF No. 13-3 at 13-14; *see also* PFFCL at 7:23-25, 9:15-19; RFFCL at 13:18-20.

On April 13, 2015, Petitioner transferred the $4,135.01 to Moussa's bank account.  CAR, ECF No. 13-2 at 183, 185.  Three days later, on April 16, 2015, GWG was dissolved.

On April 17, 2015, Moussa e-mailed Petitioner and said, "Plz try to transfer the remainder today; thank you."  CAR, ECF No. 13-2 at 13; RFFCL at 13:21-22.  This is the last e-mail from Moussa directly to Mr. Elhassani in the record.  Petitioner responded later that day explaining that he had "made a large payment to [the] IRS for taxes due this week," so he was just "waiting for some funds to arrive from PayPal," so he could send him the remaining $2,000.00.  CAR, ECF No. 13-3 at 12.

Sometime around April 14, 2015, after Petitioner's last transfer to Moussa, "Samantha and her two children crossed the border from Turkey into Syria along with Moussa and Abdelhadi." *Elhassani II*, 2020 WL 7232419; *see also* Defendant's Objections and Clarifications to the Presentence Investigation Report and Sentencing Memorandum, *Elhassani II*, 2020 WL 7232418 (N.D. Ind. Aug. 17, 2020); RFFCL at 22:15-17.

Sometime around the third week of April 2015 (*i.e.*, April 19, 2015 through April 25, 2015), Petitioner spoke to his brother, Yassine, who also lived in Elkhart, Indiana and informed Petitioner that Moussa and Samantha had left.  Transcript II at 4, 11:18-21; PFFCL at 9:25-10:2.  Petitioner testified that he was upset that Moussa "just left his role at the warehouse."  Transcript II at 5, 15:14-17.  At the hearing, Petitioner testified that after he learned Moussa left, he tried to call and text to find out where he was, but Moussa did not answer.  PFFCL at 10:9-10.  From April 2015 through May or June 2015, Petitioner knew Moussa and his family had departed Indiana but did not know they had departed the U.S.  Applicant Decl. at 145, ¶¶ 12-13.

Sometime in May or June 2015, Petitioner spoke on the telephone with his parents, who informed him that they heard Moussa, his family, and Abdelhadi may be in Hong Kong and might head to Morocco afterwards.  Transcript II at 5, 15:19-20; PFFCL at 10:14-17 (citing Applicant Decl. at 145, ¶ 13).  Sometime after this initial telephone call but before August 20, 2015, Petitioner spoke with his parents again, during which they told him that they had heard that Moussa, Samantha, and Abdelhadi may be going to Turkey. PFFCL at 10:20-23.

Almost four months after learning of Moussa's departure, on August 19, 2015, Petitioner's mother, Rkia Fourdaous, *see* CAR, EC No. 13-1 at 40; TT at 60:16-23, e-mailed Moussa the following message while carbon copying at least seven family members, including Petitioner:

Hello, Moss,

> I'm waiting [for] a word from you … , but nothing.  I've waited forever.  I wanted to have a sign of life from you.  I want[ed] to write [to] you for your birthday.
>
> What's going on with Sam?  With the kids?
>
> What are you trying to say of this silence?  It's very hard, hard. …[D]o you need help?  Do you want us to come help?  Tell us something.  We are awaiting your response.[12]

CAR, ECF No. 13-3 at 23; PFFCL at 10:11-28.  In response to his mother's e-mail, Moussa "replied all" and provided a lengthy response:

> Salam [Greetings] everyone!   We miss you very much! Alhamdulillah all is well!
>
> I am sorry I haven't replied to you in a while!  I just installed internet at home now and I can reply fast.  I am still setting up a desk and things around the house.
>
> Alhamdoulillah I bought a house! Alhamdoulillah!  Please pray for us and tell baba to do the same.  Please tell him not to pray against us.  ***We have nothing to do with the war going on.***  In fact[,] we see no sign of it! The media makes it seem big[,] but I swear I have not seen no sign of it!!!

---

[12]     This message was originally written in French.  The above translation was provided through Petitioner's own testimony at the hearing when he was asked to translate the e-mail.  *See TT* at 61:15-24.  Although the Court acknowledges the questionable accuracy of Google Translate services, it also notes that the Google Translate version of the original French e-mail results in roughly the same translation as the one provided by Petitioner at trial.  *But see Novelty Textile, Inc. v. Windsor Fashions, Inc.*, 2013 WL 1164065 at *3 (C.D. Cal. Mar. 20, 2013) ("The court notes, first, that a translation by Google Translate is not sufficiently reliable to make it admissible.").   However, neither party has disputed Petitioner's translation, and this e-mail is tangentially relevant and not determinative of the Court's decision.  *See, e.g., Novelty Textile, Inc. v. Windsor Fashions, Inc.*, No. 2:cv-12-05602-DDP-MANX, 2013 WL 1164065, at *3 (C.D. Cal. Mar. 20, 2013) ("The court therefore cannot rely on any of the translated website information in determining the services offered by KAMA and its membership benefits.").

We live in what they call the reef![13]  it is like farmlands far away from any village or city.  We are close to a big river.  We have unlimited water but no electricity.  I just bought a gas generator.  gas here is sooooo cheap! 1 gallon is around $1.  random farmers around have oil wells and produce gas themselves! 1 gallon costs around $1.20

Alhamdoulillah with the money we saved we are living really good!!  A chicken buritto made of organic chicken and organic vegetables costs 75 cents!!!  2 pounds of bread cost 1$!!! (that comes up to 12 rolls of french bread!!!).  The house we bought is about 100 square meter.  It cost us $5000 only!  We were going to buy a 1000 square meter mansion by the river for around 36000$ but that would leave us broke ... The weather is amazing alhamdoulillah! dry and warm ... (No more suffocating humidity or dead freezing winter)

Baba please don't pay so much attention to Abdelhadi's emails[14] ... He listens to too many shouyoukh's mp3's and youtubes videos ... He doesn't know that those shouyoukhs only talk and don't do nothing!!!

Abdelhadi knows that; that is why he is at his farm house watching his brand new Panasonic flat screen TV eating a lamb buritto that cost him 90 cents!

He knows each shaykh he is listening to has a nice office with a big desk and a nice library and has a big monitor and a nice desktop; a nice microphone and nice audio editing software ... actually most of them have a team of editors working for them ... and a little servant who runs and get him fresh hot tea!

---

[13]    At trial, Petitioner testified that the word "reef" in Arabic is a general word for "farmlands," "the country," or "the countryside," and that every country has a "reef." PFFCL at 11:4-6.  He elaborated that the word does not refer to a specific, precise geographical location, and that Morocco also has an area known as the "reef," while in the United States, the Midwest would likely be considered the "reef."  PFFCL at 11:5-10.

[14]    Although Petitioner had set up a filter to block Abdelhadi's e-mails, based upon Moussa's comments regarding Abdelhadi's e-mails, which Petitioner states he had not seen, Petitioner suspected Abdelhadi had joined a religious or fundamentalist group. PFFCL at 12:22-25.

**Please understand we didn't leave because we have something against the US or americains** [sic]. **Americains** [sic] **are some of the greatest people in world!** I can confirm that to you after meeting many races now that we've traveled a little bit. I am very grateful for the many times I got saved while in the U.S.! Like when I was stuck in middle of a snow storm with the Dodge Viper on Mount Shasta! The car was half buried in snow[,] and I had no winter clothes! No phone service! Nada! Alhamdoulillah a guy came with his bulldozer and got me out and took me to nearest town where there was a hotel! That is just one of the many nice things you don't see many people in the world do for you!

**The reason why I left was because I was really tired of being illegal!** Stupid immigration attorney Meza pretty much robbed me of 3500$ ... years went by since I paid her and she said I had to re-do all the papers from scratch (go again to hospital and pay $400, get all the birth certificates, marriage certificates, public notaries, pay again immigration fees ... )

Plus[,] the IRS was sending me letters ... It wasn't just from the IRS it was from an agent that they assigned for my case!! He was from Indianapolis. He was sending me letters every week. He was saying that my taxes were seriously messed up and that they were getting ready to seize property, cars, and even have all my income goes directly to them ... **I told him everything was going to be paid up by the deadline of 2015 (April 15th)**

Even If I figured out something with the IRS and immigration[,] I would have been legal but poor with no money except a house that was falling apart and an extremely cold winter! -15 degrees with an average of 6 feet of snow! My spine has major problems from **working in the cold lifting heavy stuff** (heavy boxes, lifting garage doors, pallets, attaching and detaching towing trailers, **shoveling snow**, carrying Sarah ... ) I have 2 herniated spine disks (Disk # C 1 which makes my neck paralyzed most of winter unless I take really strong prescribed pain killers (tramadol or Tylenol 3)) and also disks# Tl 1 & T12!!! When these start hurting[,] I have to basically lie down on the ground flat on my back for a while until the pain goes away ... Also knee and hips problems for Sam ... wrist problems and ankles problems ... We were slowly dying!!!! Also ear infections sore

-18-

throats that last months .... !!!

**Going back to [M]orocco was not easy** ... Sending money to [M]orocco by wire was impossible since the IRS was gonna take it before it leaves the US.  Sam went to [M]orocco to see if taking cash/gold was easy[,] but those guys in the Mohamed V airport were very scary!  They went through her luggage like crazy and confiscated many many things!  I was not about to go and have them confiscate the Porsche money and give me a receipt instead!!

**Please please please ignore what abdelhadi is saying he is doing nothing but sitting home and watching aljazeera[15]!**  Please don't be mad at us for leaving.  Inchallah soon the borders will open up ... new american president and inchallah they will get rid of bashar[16] and things will become even better .... right now[,] we keep to ourselves and no one come to bother us ... there is no police on the road or army people ... where we are at it is completely safe bi idni allah!

Please don't forget us in your prayers ... we never do forget you!  Thank you for understanding ... We hope we are not causing you any trouble.

**Sorry for not answering to your emails and leaving you worried for a long time.**

I hope things are doing great for you all!

CAR, ECF No. 13-3 at 17-20 (emphasis added); RFFCL at 14:5-7.  Nowhere in this e-mail did Moussa explicitly state where he was located at the time he wrote the e-mail.  *See id.*; *see also* PFFCL at 11:11-12.  It refers to him and Samantha as having been in Morocco, but it also refers to a desire for the borders to open up if Bashar al-Assad is no longer president.  *Id.*  Petitioner testified that because Syria is next door to Turkey, and Moussa

---

[15]     Al Jazeera is an English television news channel.

[16]     Moussa's reference to getting rid of Bashar refers to Bashar al-Assad, the President of Syria at the time.  *See* Jan González Vega, *Syrian Refugee Crisis and National Security*, 60 Rev. Der P.R. 275, 284 (2020) ("As of today, Syria is controlled by ISIS and Bashar al-Assad.").

-19-

mentioned being "very far away from the war," he assumed, but did not know, they might be "somewhere in a country in Turkey."  Transcript II at 12, 41:1-16; PFFCL at 11:17-20. That same day, Mr. Elhassani sent another e-mail in response to Moussa's e-mail, which was addressed to Moussa but cc'd their mother, Mohamad Elhassani (either their father or brother, both of whom are named Mohamed), Salaheddine, Abdelhadi, Yassine, and Zahra Elhassani.  This e-mail stated:

> Glad to hear you guys are doing fine.
>
> If you get tired there, ***move to Morocco*** & let's start an import-export business.
>
> We can ship you US cars & containers of unsold clothes & other goods to sell in Morocco and live comfortably close to our parents
>
> Use a Bitcoin wallet when you travel overseas, no one can confiscate that from you.

CAR, ECF No. 13-3 at 17-20 (emphasis added); PFFCL at 11:23-27; RFFCL at 14:8-9.  At the hearing, Petitioner testified that he wrote this e-mail at his mother's encouragement, who wanted Moussa to return home to Morocco.  PFFCL at 11:23-27.  To date, Petitioner still has not transferred Moussa the remaining $2,000.00 he owed Moussa.  *Id.* at 12:3-8.

Despite now claiming that Petitioner is "affiliated" with ISIS by virtue of his relationship with his brothers, neither USCIS nor law enforcement ever contacted Mr. Elhassani during this time.  Compl. at 5, ¶ 11; PFFCL at 13:19-21.

### 7.    *Petitioner's Application for Naturalization*

On or about November 27, 2015, after these last communications with Moussa, Petitioner filed a Form N-400, Application for Naturalization (the "Application"), along with the $680 filing fee, with USCIS.  *See* Exhibit 3 to Compl., ECF No. 1-2 at 8 (showing the N.400 Application for Naturalization Receipt Notice and payment of the $680.00 fee); JCMS at 2:14-15; PFFCL at 3:2-4; RFFCL at 14:10-11.  USCIS placed Petitioner's application in a national security program, the Controlled Application Review and

Resolution Program ("CARRP").  PFFCL at 3:5-9.  In a memorandum outlining policy for vetting and adjudicating cases involving Known Suspected Terrorist ("KST") National Security ("NS") concerns, USCIS states that "[o]fficers are not authorized to approve applications with confirmed KST NS concerns."  Exhibit 4 to Petitioner's Request for Judicial Notice ("RJN"), ECF No. 18-2 at 59, 64-65; *see also* PFFCL at 3:10-12.

On or about December 23, 2015, Petitioner appeared at a USCIS "Application Support Center" for an appointment to provide his biometrics.  JCMS at 2:14-15.

On February 22, 2016, Petitioner was added to the Terrorist Screening Database and confirmed as a KST.  CAR, ECF No. 13-1 at 36.  Despite being added to this database, to date, law enforcement has not contacted Petitioner regarding any national security concerns.  PFFCL at 3:16-20 (citing ECF No. 14 at 71; ECF No. 27 at 56).

On March 28, 2016, R.M. Gonzales, who was part of the CARRP, submitted the following eligibility assessment: "Pending interview, submission of court documents and de-confliction of KST(B10) status, EL HASSANI appears to be statutorily eligible for naturalization at this time.  However, focus on employment and possible marriage fraud is warranted."  PFFCL at 3:5-9 (citing ECF No. 13-1 at 36).  As Petitioner points out, and as a point of concern, this document erroneously states that Petitioner was born in Iraq, when he was born in Morocco, and states that he was married with no children, when, in fact, he has three children.  *Id.* at 3:26-28.

Sometime between July 2017 and September 6, 2018, while Petitioner's Application was pending, Moussa was killed in a drone strike in Raqqa, Syria.  *See* CAR, ECF No. 13-3 at 44; RFFCL at 14:12-17.  From April through August 2018, the fact that Samantha was in Syria and that Moussa had died received media attention.  RFFCL at 14:18-20.

a.   *Petitioner's First September 10, 2018 Interview*

Almost three years after filling his Application, on September 10, 2018, USCIS interviewed Petitioner.  JCMS at 2:16; PFFCL at 3:21-23; RFFCL at 14:22-24.  As part of the interview, the officer transcribed the questions and answers, and Petitioner does not dispute the Record of Sworn Statement, which he signed at the conclusion of the interview.

PFFCL at 13:27-14:10.  Petitioner believed his interview would concern topics such as his family, marriage, and employment.  However, USCIS questioned Petitioner extensively regarding his most last communications with his brothers (*i.e.*, the e-mails from almost three years before the interview from the April 2015 and August 2015 between Petitioner and his family), without specifically referencing or showing him those e-mails.  PFFCL at 14:11-19.

During the interview, Petitioner made the following statements, which are indisputably false; however, Petitioner claims he did not know the statements were false at the time he made them.  *See* Compl. at 5-6, ¶¶ 13-15.  First, the questioning USCIS officer asked Petitioner whether he spoke with, or transferred money to, his brothers after they departed the U.S., without first establishing when Petitioner learned his brothers departed the U.S.  PFFCL at 16:3-8.  Petitioner testified that he did not have any contact with Moussa or Abdelhadi after they left the U.S., except for a mass e-mail during the holidays from Abdelhadi.  Transcript I at 42; PFFCL at 15:8-15; RFFCL at 14:24-28.  Second, he testified that he never transferred any funds to Moussa after he departed the U.S., and the only money he transferred was for payment for contractor services.  Transcript I at 42-43; PFFCL at 15:22-16:2-14; RFFCL at 14:24-28.  Third, he denied having any knowledge regarding Moussa's whereabouts after April 2015 except that he went to Hong Kong and planned to go to Morocco and then perhaps to Turkey at some point.  Transcript I at 42; RFFCL at 14:24-28.  Fourth, when asked whether he had any siblings that were members of a terrorist organization, he stated that he had brothers with whom he had not spoken to in several years and did not know their affiliations or associations.  Transcript I at 41, 43; ECF No. 14 at 51; PFFCL at 14:24-15:1.

Additionally, when asked about Moussa's duties related to his work for GWG, Petitioner also testified that he performed "work around the warehouse, like mowing trees and … shoveling snow."  Transcript I at 41; ECF No. 14 at 55.  Petitioner also stated that he "did not handle payroll."  *Id.* at 43.

Toward the end of the interview, the USCIS interviewer showed Petitioner, on his

-22-

1  computer monitor, a story in the *Chicago Tribune* about Samantha and verbally informed
2  Petitioner that Moussa had died in a drone strike.  Transcript I at 44; PFFCL at 4:1-4 (citing
3  ECF No. 14 at 72-73), 16:22-17:1; RFFCL at 15:1-6.  The officer also advised that
4  Samantha had been extradited to the U.S. for prosecution for material support to a Tier 1
5  Terrorist Group.  Transcript I at 44; PFFCL at 4:5-8 (citing ECF No. 14 at 73).

b.    *USCIS Denial*

7      After the September 10, 2018 interview, USCIS obtained Petitioner's bank records
8  and the e-mails between him and his brother Moussa.  RFFCL at 15:7-8.

9      On January 24, 2019, USCIS issued a Notice of Intent to Deny ("NOID"), alleging
10  that Petitioner (1) made intentional false statements under oath; (2) was "affiliated" with
11  ISIS under 8 U.S.C. § 1424(a)(4)(C) due to his last payment to Moussa for Moussa's work
12  as an independent contractor at Petitioner's wife's company; and (3) failed to establish his
13  good moral character under 8 C.F.R. § 316.10(a)(2).  JCMS at 2:19-20; PFFCL at 4:13-20,
14  17:11-19; RFFCL at 15:9-10.  The NOID provided Petitioner with 30 days to respond.
15  Compl. at 12, ¶ 42.

16      On February 26, 2019, Petitioner timely submitted a response to the NOID, asserting
17  that he had not made intentionally false statements under oath, was not affiliated with ISIS,
18  and was otherwise a person of good moral character.  PFFCL at 4:21-23, 17:24-18:1;
19  RFFCL at 15:10-14.  Petitioner even provided additional April 2015 e-mails that he found
20  from Moussa along with providing a Declaration.  PFFCL at 18:5-7.  Nonetheless, on April
21  4, 2019, USCIS denied his application on the same grounds as set out in the NOID.  PFFCL
22  at 4:24-26, 18:8-11; RFFCL at 15:11-14.

23      On April 24, 2019, Petitioner timely filed his Form N-336, Request for a Hearing on
24  a Decision in Naturalization Proceedings, as 8 U.S.C. § 1447(a) requires.  *See* Exhibit 5 to
25  Compl., ECF No. 1-2 at 10; PFFCL at 4:27-5:3, 18:10-11.

26      In advance of the October 30, 2019 interview, USCIS provided him with a copy of
27  the Record of Sworn Statement and the audiovisual recording of the September 10, 2018
28  interview.   JCMS at 2:23-25; RFFCL at 15:15-16.  Petitioner submitted his supporting

brief at the interview and responded to all questions.

c.   *Petitioner's Second October 30, 2019 Interview*

On October 30, 2019, USCIS held an interview on the Form N-336 at the San Diego Field Office in connection with his administrative appeal.   JCMS at 2:23-25; PFFCL at 45:4-7, 18:12-14; RFFCL at 15:15-16.

During this interview, Petitioner testified that he did not realize that his brother and Samantha left the country until around the third week of April.  ECF No. 24 at 4.   Next, when asked about Moussa's job duties again, Petitioner stated that Moussa would help around the warehouse by plowing snow, cutting trees, breaking pallets, moving pallets, and transferring overstocked items from one warehouse to another.  *Id.* at 5, 7.   Toward the end of the interview, Petitioner stated that he had learned of his brother Moussa's death in "some newspaper or, I mean, some magazine." *Id.* at 13; RFFCL at 15:17-19.   He elaborated that at the September 10, 2018 interview, he was told about "a big news article."  *Id.*

On December 12, 2019, Petitioner submitted a request under the Freedom of Information Act (the "FOIA") to USCIS for a copy of the audiovisual recording of the October 30, 2019 interview and for "[a]ny and all documents related to or obtained as a result of the Applicant's N-400 filing on 11/27/2015 and N-336 filing on 4/24/19, including any all of the Applicant's own emails and bank records obtained from the grand jury subpoena reference #2016R01109-020."  Compl. at 13, ¶ 48.

d.   *Final Denial*

On July 15, 2020, USCIS denied Petitioner's Form N-336 on the same grounds as in the original denial of the Form N-400.  JCMS at 3:1; PFFCL at 5:8-9, 18:27; RFFCL at 15:20.   Petitioner has exhausted his administrative remedies under 8 U.S.C. § 1447(a) and now seeks a de novo review of the denial and a de novo hearing under 8 U.S.C. § 1421(c). Compl. at 15, ¶ 55.

**8.   *Prosecution of Moussa's Wife, Samantha***

Petitioner acknowledges in his Complaint that the U.S. Department of Justice has prosecuted Samantha for financing terrorist activities and has contacted at least one of

Petitioner's other siblings about Moussa and Samantha.  Compl. at 14, ¶ 53.  However, Petitioner has not been contacted nor questioned by any law enforcement agency in connection with Moussa or Samantha.  *Id.*

On March 21, 2018, almost six months before Petitioner's first interview, an indictment was returned while Samantha was still with her children in a Kurdish refugee camp, which charged her with making a false statement to the Federal Bureau of Investigation ("FBI") three years earlier in violation of 18 U.S.C. § 1001.  *See Elhassani II*, 2020 WL 7232418 (citing ECF No. 1 in *Elhassani I*, Case No. 18-cr-00033).  In late July 2018, the government executed the arrest warrant and flew Samantha back to the U.S. on a military cargo transport plane.  *Id*

On August 22, 2018, a superseding indictment was returned by a grand jury, which charged Samantha with (1) Conspiracy to Provide Material Support to ISIS, from Fall 2014 through Summer 2015, in violation of 18 U.S.C. § 2339B(a)(1) and (2) Aiding and Abetting two individuals in Providing Material Support to ISIS, from March 23, 2015 through April 7, 2015, in violation of 18 U.S.C. § 2 and 18 U.S.C. § 2339B.  *Elhassani II*, 2020 WL 7232419 (citing ECF No. 23 in *United States v. Samantha Elhassani*, Case No. 18-cr-00033).

On November 25, 2019, an information was filed against Samantha, pleading that she "[b]etween on or about February 2015 and on or about March 2015, … did knowingly conceal and disguise the nature, location and control of material support and resources, knowing and intending that the support and resources were to be provided by Individuals A and B as material support to the Islamic State of Iraq and al-Sham (ISIS), in violation of Title 18, United States Code Section 2339B(a)(1), 2339C(c)(2)(A) and 2."  *See Elhassani II*, 2019 WL 11318371 (N.D. Ind. Nov. 25, 2019).  That same day, Samantha entered into a plea agreement, pursuant to which she pled guilty to Count 1 of the information, charging her with the lesser offense of financing terrorism.  *See Elhassani II*, 2019 WL 11318372 (N.D. Ind. Nov. 25, 2019).  In this Plea Agreement, she admits the following facts:

a.   In November 2014, I was informed by my husband, Individual A [Moussa], that he and his brother, Individual B [Abdelhadi], wanted to travel to Syria to live in the Caliphate and join ISIS.

b.   Between November 2014 and April 2015, I helped Individuals A and B join ISIS, by making three trips abroad to Hong Kong.

c.   During the first two trips, I transported more than $30,000 in cash and gold from the United States and deposited these items in a safe deposit box in Hong Kong.  At the time I transported the funds and gold, I knew that Individuals A and B had expressed an interest in joining ISIS and that Individuals A and B intended to use these resources to support ISIS.

d.   I concealed the support and resources described above by: (1) transporting gold that was melted down to look like jewelry and (2) not disclosing the cash and gold on customs declaration forms.

e.   I performed these acts knowingly and willingly and with the knowledge that ISIS was a foreign organization involved in terrorist activities.

*Id.*

The government points out that Samantha also worked as a confidential informant for the FBI "but did not report *on* her brother-in-law's business." *Elhassani II*, 2020 WL 7232420 (N.D. Ind. Sept. 4, 2020) (original emphasis).[17]   Rather, she "worked in a secondary shipping business that facilitated shipments between U.S.-based vendors and individuals located in places where those vendors did not directly ship."  *Id.*  From company records readily available to her, Samantha "provided information about

---

[17]   The Court notes that this record confirms Samantha "received compensation for her information, but her assistance ended in mid-November 2014, just before Moussa told her about his desire to join ISIS." *Elhassani II*, 2020 WL 7232420 (N.D. Ind. Sept. 4, 2020). It is unclear if the reference to "her brother-in-law's business" is to GWG.  That being said, "the FBI … was using Samantha to surveil the El Hassani warehouse during the same time." *Elhassani II*, 2020 WL 7232418.  To the Court's knowledge, no charges have been filed against Petitioner related to any malfeasance with any packages shipped from GWG. This indicates that to the extent Moussa may have shipped packages from the GWG warehouse to facilitate his efforts to join ISIS, the government did not find evidence showing Petitioner had knowledge of it.

-26-

customers and shipments of interest to the FBI." *Id.*

On November 17, 2020, Samantha pled guilty to count 1 of the superseding Information on November 25, 2019, and the government dismissed the indictment against her in Case Number 2:18-cr-00033. *See* Amended Judgment, *United States v. Elhassani*, No. 2:19-cr-00159-PPS-JEM, 2020 WL 7082758, at *1 (N.D. Ind. Nov. 17, 2020). Samantha was sentenced to 78 months in prison. *Id.*

### B.   <u>Procedural History</u>

On November 4, 2020, Petitioner filed his Petition for *de novo* review of denial of his application for naturalization and request for a hearing pursuant to 8 U.S.C. § 1421(c). *See* Compl.; PFFCL at 5:10-12.   On February 26, 2021, the parties lodged the administrative record with the Court in compliance with the Court's Scheduling Order. ECF Nos. 13, 14.

On May 28, 2021, Petitioner timely submitted his hearing Brief.   ECF No. 17. Petitioner also filed a Request for Judicial Notice.   ECF No. 18 at 1.

On June 25, 2021, USCIS submitted its hearing brief, which focused predominantly on why the Court should deny Petitioner's Request for Judicial Notice rather than why the USCIS decision was correct.   ECF No. 19.   On July 9, 2021, Petitioner submitted his reply brief, which focused on supporting his Request for Judicial Notice.   ECF No. 20.   On July 23, 2021, USCIS submitted its reply brief, which recited the relevant law that applies to this case but still failed to advance any arguments relating to the factual issues.   ECF No. 21.

On August 2, 2021, USCIS filed its own Request for Judicial Notice.   ECF No. at 22 at 1.   On August 7, 2021, Petitioner filed a response to USCIS' Request for Judicial Notice.   ECF No. 23 at 1.

On August 23, 2021, USCIS lodged a copy of the transcript of Petitioner's October 30, 2019 interview with the Court.   ECF No. 24.

On August 30, 2021, Petitioner appeared before this Court for trial.   *See* HT.

### III.   <u>LEGAL STANDARD</u>

-27-

District courts have original jurisdiction over all "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Immigration and Nationality Technical Corrections Act of 1994, 8 U.S.C. §§ 1100 *et seq.* (the "INA"), governs an individual's ability to become naturalized as a U.S. citizen. *Orellana v. Mayorkas*, 6 F.4th 1034, 1042 (9th Cir. 2021) ("The relevant framework for establishing eligibility for naturalization is set forth in 8 U.S.C. § 1427(a) and the implementing regulations, 8 C.F.R. part 316."). It also vests district courts with the task of reviewing *de novo* any denial of an application for naturalization. 8 U.S.C. § 1421(c); *see also* Compl. at 7, ¶ 18; *see also* JCMS at 1:23-25

Under the INA, an individual seeking naturalization must have (1) resided continuously, after being lawfully admitted for permanent residence, within the U.S. for at least five years immediately preceding the date he or she filed the application for naturalization and been physically present for at least half of that time; (2) resided continuously within the U.S. after the date the applicant applies for naturalization through the time of admission to citizenship; and (3) qualify as "a person of good moral character" during all periods that he or she resided in the U.S. 8 U.S.C. § 1427(a); *see also* 8 C.F.R. § 316.2(a) (citing the same requirements in addition to requiring that the individual be at least 18 years of age). An individual applying for naturalization must also submit to biometric screening. *See* 8 U.S.C. § 1440f (requiring the Secretary of Homeland Security to use the fingerprints provided by an individual at the time the individual files for an adjustment of status if the individual applies for naturalization under the INA). "The applicant shall bear the burden of establishing by a preponderance of the evidence that he or she meets all of the requirements for naturalization." 8 C.F.R. § 316.2(b); *see also Berenyi v. Dist. Dir., Immigr. & Naturalization Serv.*, 385 U.S. 630, 637 (1967) (providing that an alien applicant seeking naturalization bears the burden of showing "his eligibility for citizenship in every respect"). Any doubts regarding eligibility for "should be resolved in favor of the United States and against the claimant." *Berenyi*, 385 U.S. at 637.

1    The INA vests the Attorney General with the authority to designate an employee "to
2    conduct examinations upon petitions for naturalization." 8 U.S.C. § 1446(b). Following
3    the examination, the employee designated to conduct the examination determines "whether
4    the application should be granted or denied" while stating the reasons for doing so. 8
5    U.S.C. § 1446(d). "In determining whether the applicant has sustained the burden of
6    establishing good moral character and the other qualifications for citizenship," the Attorney
7    General, or district court conducting judicial review, "shall not be limited to the applicant's
8    conduct during the five years preceding the filing of the petition, but may take into
9    consideration as a basis for such determination the applicant's conduct and acts at any time
10   prior to that period." 8 U.S.C. § 1427(e).

11   If the individual's application for naturalization is denied, "the applicant may request
12   a hearing before an immigration officer." 8 U.S.C. § 1447(a). Thus, "[u]nsuccessful
13   applicants must first take an administrative appeal of the denial and complete the INS's
14   administrative process before seeking judicial review." *United States v. Hovsepian*, 359
15   F.3d 1144, 1162-63 n.15 (9th Cir. 2004) (citing 8 U.S.C. § 1421(c), (d); 8 U.S.C. § 1447(a);
16   8 C.F.R. § 336.2). If after that hearing, the application remains denied, the person "may
17   seek review of such denial before the United States district court or the district in which
18   such person resides." 8 U.S.C. § 1421(c); *see also* 5 U.S.C. §§ 701 *et seq.* (providing for
19   judicial review of agency action). "Such review shall be de novo, and the court shall make
20   its own findings of fact and conclusions of law and shall, at the request of the petitioner,
21   conduct a hearing de novo on the application." 8 U.S.C. § 1421(c). On the one hand, "[t]he
22   court may not rely on the [USCIS]' findings of fact or law and, on request, must hold its
23   own hearing on the naturalization application." *Hovsepian*, 359 F.3d at 1162 (noting that
24   "*even if the [USCIS] is allowed to make the initial decision on a naturalization application,*
25   *the district court has the final word* and does not defer to any of the [USCIS]' findings or
26   conclusions"). On the other hand, "[t]his does not necessarily require an evidentiary
27   hearing or bench trial, however, nor is summary judgment precluded where there is no
28   genuine issue of material fact." *Garcia-Garcia v. Holder*, No. 08-cv-01129-LAB (AJB),

2010 WL 1292155, at *2 (S.D. Cal. Mar. 30, 2010) (Burns, J.) (citing *Abghari v. Gonzales*, 596 F. Supp. 2d 1336, 1343-44 (C.D. Cal. 2009) (citing *Chan v. Gantner*, 464 F.3d 289, 295-96 (2d. Cir. 2006))).  Further, although the Court shows no deference to the USCIS' findings or conclusions on legal issues, *Hovsepian*, 359 F.3d at 1162, the Court may rely on the record from in the USCIS proceedings but may also establish its own factual findings, *see, e.g.*, *Saliba v. Att'y Gen. of United States*, 828 F.3d 182, 189 (3d Cir. 2016) ("As a consequence, judicial review of naturalization denials 'is not limited to any administrative record but rather may be on facts established in and found by the district court de novo.'").  *See also Aparicio v. Blakeway*, 302 F.3d 437, 445 (5th Cir. 2002); *Abghari*, 596 F. Supp. 2d at 1343.

At the hearing, the "applicant for naturalization may present testimony and documents to the district court to establish eligibility."  *Orellana*, 6 F.4th at 1042.  Both the Federal Rules of Civil Procedure and Federal Rules of Evidence apply to such hearings. *See id.* at n.3 (rejecting the argument that the Federal Rules of Civil Procedure do not apply to a district court's review of the denial of a naturalization petition; the Federal Rules of Evidence "apply to proceedings in United States courts," and "[a] judicial review of a denial of a naturalization application is one such proceeding") (citing FED. R. EVID. 101, 1101); *see also Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 262 (3d Cir. 2012) (applying the Federal Rules of Evidence in reviewing the denial of a naturalization application); *see also* FED. R. CIV. P. 81(a)(3) ("These rules apply to proceedings for admission to citizenship to the extent that the practice in those proceedings is not specified in federal statutes and has previously conformed to the practice in civil actions.").

## IV.   **CONCLUSIONS OF LAW**

Petitioner asked the Court "[c]onduct a *de novo* hearing on Petitioner's application for naturalization."  Compl. at 16, ¶ 59(b).  He asks the Court to "grant Mr. Elhassani naturalization and administer the oath of allegiance" because he argues he (1) "did not intentionally provide false statements under oath with the intent of obtaining an immigration benefit"; (2) "is not affiliated with ISIS, as that term is defined in the

regulations, because he never voluntarily or knowingly gave, lent, or promised anything of value to ISIS"; and (3) "is otherwise a person of good moral character who satisfies the requirements for naturalization." JCMS at 3:5-10. USCIS responds that its denial of Petitioner's naturalization was well-founded, and "Petitioner lacks good moral character and is therefore not entitled to naturalization to U.S. citizenship." *Id.* at 3:12-14 (citing 8 U.S.C. § 1427). It explains that Petitioner lacks good moral character because he made false statements during his interviews on his Application. *Id.* at 3:11-14; *see also* 8 U.S.C. § 1101(f)(6) ("one who has given false testimony for the purpose of obtaining any benefits under this chapter" lacks good moral character).

As stated, under the INA, an individual seeking naturalization must, *inter alia*, meet various residency requirements, submit to a biometrics screening, and qualify as a person of good moral character. 8 U.S.C. § 1427(a); *see also* 8 C.F.R. § 316.2(a) (citing the same requirements in addition to requiring that the individual be at least 18 years of age). The parties stipulate that Petitioner meets all of the requirements for naturalization other than good moral character. JCMS at 3:5-10; PFFCL at 22:9-24. Thus, the sole issue before the Court is whether Petitioner has established sufficient facts for the Court to find he has met his burden of showing he possesses good moral character for citizenship. In doing so, the Court is "not subject to the rules governing typical immigration cases," which bind courts "by an immigration judge's factual and credibility determinations." *Bijan v. United States Citizenship & Immigr. Servs.*, 900 F.3d 942, 945 (7th Cir. 2018). Rather, the Court may make its own factual findings and credibility determinations.

"Above all else, [courts] are concerned with the character of a petitioner." *In re L.*, 59 F. Supp. 179, 180-81 (N.D. Cal. 1944). It is a person's "character which determines whether he [or she] will make a good citizen." *Id.*; *see also United States v. Leles*, 236 F. 784, 786 (N.D. Cal. 1916) ("One of the essential qualifications for admission to citizenship is that the applicant shall be a man of good moral character.").

Following a bench trial in this matter conducted pursuant to 8 U.S.C. § 1421(c), the Court makes the following findings of fact and conclusions of law: In this case, the Court

finds that Petitioner has been married for seventeen years, with three young children that he helps support, and he has remained gainfully employed throughout his time in the U.S., even creating jobs for others.  PFFCL at 27:2-9.  While the Court does not find Petitioner voluntarily or intentionally affiliated with ISIS, as set forth below, it concludes that some of his Petitioner's testimony was not credible and intentionally false, which when considered with his past relevant conduct, demonstrates a lack of good moral character, disqualifying him from citizenship.  However, before addressing particular findings of fact and conclusions of law, the Court considers the parties' pending requests for judicial notice as such information has informed the Court's findings on moral character.

### A.   <u>Request for Judicial Notice</u>

The court may take judicial notice at any stage of a proceeding of (1) facts not subject to reasonable dispute and "generally known within the hearing court's territorial jurisdiction" and (2) adjudicative facts, which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b)(1)-(2).

On May 28, 2021, Petitioner filed a Request for Judicial Notice, asking the Court to take judicial notice of four exhibits, seeking to prove "what information was in the public realm" at the time of his naturalization interview.  RJN, ECF No. 18 at 1.  Petitioner seeks judicial notice of three different articles as well as a USCIS Memorandum.  *Id.* at 2.  He fails to specify particular facts within the article or memorandum of which he would like the Court to take judicial notice.  Respondent largely objected to the Court taking judicial notice on the basis that Petitioner was improperly attempting to supplement the administrative record as to what knowledge was in the public realm.  ECF No. 19 at 3:22-25

Other courts have taken judicial notice of USCIS Policy Manuals and Memoranda.  *See, e.g.*, *Attias v. Crandall*, 968 F.3d 931, 936 (9th Cir. 2020) (affirming the decision of the district court, which granted summary judgment in favor of USCIS, while noting that in its "summary-judgment order, the district court sua sponte took judicial notice of

USCIS' [ ] *Policy Manual*").   Further, Respondent has not advanced any argument objecting to the Court taking judicial notice of this document, other than generally objecting to the supplementation of the record.  However, Petitioner's Request for Judicial Notice is flawed in that it asks the Court to take judicial notice of entire documents rather than specific facts from the documents or the fact that the documents were published on a specific date.  This is improper.  Thus, the Court **DENIES-IN-PART** Petitioner's Request for Judicial Notice to the extent it asks the Court to take judicial notice of entire documents without specifying particular facts, if any, from those documents of which the Court should take judicial notice.  However, Petitioner does rely on certain facts in his briefing.  *See* PFFCL at 3:10-12.  Thus, the Court **GRANTS-IN-PART** Petitioner's request by taking judicial notice of the fact that the USCIS memorandum (1) outlined a policy for vetting and adjudicating cases involving KST NS concerns and (2) states that "[o]fficers are not authorized to approve applications with confirmed KST NS concerns."   Exhibit 4 to Petitioner's RJN, ECF No. 18-2 at 59, 64-65.

On August 2, 2021, Respondent filed its own Request for Judicial Notice, asking the Court to take judicial notice of all publications prior to Petitioner's September 10, 2018 and October 20, 2019 USCIS interviews, which reported the fact that Petitioner's brother, Moussa, had been killed in Syria while fighting for ISIS, including but not limited to the publications listed below.  ECF No. at 22 at 1.  Respondent seeks to show that "Petitioner likely knew, by the time of his interviews, that his brother had died fighting for ISIS."  *Id.* at 2.  On August 7, 2021, Petitioner filed a Response to USCIS' Request for Judicial Notice, advising that he "did not object to the Court taking judicial notice of publications regarding Moussa and Samantha Elhassani, regardless of the date of publication."  ECF No. 23 at 1.  However, he objects to any attempt by Respondent to make belated arguments that it should have advanced in its hearing brief.  *Id.* at 1-2.  He also advises that the USCIS' "motion is inconsistent . . . with its June 25, 2021 objection to [Petitioner]'s request for judicial of three media publications and one USCIS Memorandum."  *Id.* at 1:24-28 (citing ECF No. 19 at 2).  He states that "if the Court grants [his] Request for Judicial Notice (ECF Nos. 18,

18-1, and 18-2), then [he] has no objection to the Court judicial notice of any media accounts regarding Moussa and Samantha Elhassani, regardless of their date of publication." *Id.* at 4.

The Court **DENIES-IN-PART** the Respondent's Request for Judicial Notice to the extent it also asks the Court to take judicial notice of entire articles or publications. However, "[c]ourts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.'" *See Von Soher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1125-26 (9th Cir. 2002); *see also Ochoa v. Santa Clara Cty. Off. of Educ.*, No. 16-CV-03283-HRL, 2017 WL 11619097, at *2 (N.D. Cal. Aug. 17, 2017) (noting that courts may take judicial notice of articles where the moving party "is not trying to prove the contents of the articles, but merely the fact that they were published and circulating in the public realm at the time"). Thus, the Court **GRANTS-IN-PART** Respondent's Request for Judicial Notice to the extent it asks for take judicial notice of the fact that Moussa's death was in the public realm before the September 10, 2018 Interview but not necessarily that Petitioner knew that Moussa had been killed before his interview.

### B.     Petitioner is Not Disqualified due to Affiliation with a Terrorist Group

The USCIS Decision states that Petitioner failed to qualify pursuant to 8 U.S.C. § 1424(a)(4)(C), which states that "no person … shall be naturalized as a citizen of the United States …. who advocates or teaches or who is a member of or affiliated with any organization that advocates or teaches … (C) the unlawful damage, injury, or destruction of property." 8 U.S.C. § 1424(a)(4)(C). The USCIS decision concludes that "the evidence establishes that you are affiliated with the tier 1 terrorist group ISIS as evidenced by the fact that on March 7, 2015, you personally emailed your brother Abdelhadi (and copied Moussa) warning him to stop emailing you regarding the subject 'ISIS group.'" Decision at 100-101. USCIS also argues that "[s]ervice records show that you knew of Abdelhadi's interest in ISIS *prior to* [his] April 2015 money transfers to Moussa." Decision at 101.

-34-

Thus, Respondent contends that even though Petitioner claims "that [his] money transfers were only to pay Moussa for his previous services at [Petitioner's] wife's warehouse, 8 C.F.R. § 313.1 makes clear that the money or other support to the organization could be used for *any purpose.*" *Id.* Respondent finds that "the money transfers you sent to Moussa while he was in Hong Kong helped facilitate Moussa in getting from Hong Kong to Syria where he followed through on his overarching plan to assist ISIS." *Id.* Petitioner alleges that he neither joined ISIS himself nor knew about or supported his brothers' decisions. Compl. at 3, ¶ 6. Rather, he pleads that he only learned about their affiliation with ISIS in his naturalization interview. *Id.* He also pleads that he was not close to his brothers, "which law enforcement apparently recognized because no law enforcement agency has ever contacted him about his brothers' actions." *Id.*

"Affiliation with an organization includes, but is not limited to, the ***giving***, lending, or promising of support or of ***money*** or any thing of value, ***to that organization*** to be used for any purpose." 8 C.F.R. § 313.1 (emphasis added). However, involuntary affiliation with an organization described in 8 U.S.C. § 1424(a) does not disqualify a person from naturalization. *See* 8 U.S.C. § 1424(d) (providing that "[a]ny person who is within any of the classes described in subsection (a) solely because of past membership in, or past affiliation with, a party or organization may be naturalized without regard to the provisions of subsection (c) if such person establishes that such … affiliation … was involuntary"); *see also* 8 C.F.R. § 313.3(d). As outlined below, the Court finds that (1) Petitioner did not provide intentionally false statements when he testified that he heard Moussa had gone to Hong Kong and was either going to Morocco or Turkey but was not certain where he was, and (2) Petitioner did not know Moussa had joined ISIS before he transferred the April 2015 money transfers for Moussa's work for Petitioner's entities. Thus, while the Court finds Petitioner lacks good moral character because he provided intentionally false statements for the purpose of gaining immigration benefits, it does not find that he fails to qualify for naturalization by virtue of being associated with a Tier 1 terrorist organization pursuant to 8 U.S.C. § 1424(a)(4)(C). While there can be no disputing that gave money to

1    Moussa, 8 C.F.R. § 313.1, it is unclear whether Moussa had joined ISIS on the dates of the

2    transfers or gave the money to ISIS.  The Court also finds that any support given by

3    Petitioner to ISIS was involuntary and inadvertent.

4        **C.**    **Intentional False Testimony During His September 10, 2018 N-400**

5            **Interview**

6        The INA provides that "[n]o person shall be regarded as, or found to be, a person of

7    good moral character who, during the period for which good moral character is required to

8    be established is, or was …. one who has given false testimony for the purpose of obtaining

9    any benefits under" its provisions.  8 U.S.C. § 1101(f)(6); *see also* 8 C.F.R. §

10   316.10(b)(2)(vi) (providing that "[a]n applicant shall be found to lack good moral character

11   if during the statutory period the applicant . . . . [h]as given false testimony to obtain any

12   benefit from the Act"); JCMS at 3:16-22.  A person will be found to lack good moral

13   character where he or she provides false testimony even "if he has told even the most

14   immaterial of lies with the subjective intent of obtaining immigration or naturalization

15   benefits." *Kungys v. United States*, 485 U.S. 759, 780 (1988).  Thus, intentional

16   misrepresentations made without the subjective intent of obtaining immigration benefits or

17   unintentional misrepresentations do not preclude the Court from finding Petitioner has

18   good moral character.  Further, "[w]illful misrepresentations made for other reasons, such

19   as embarrassment, fear, or a desire for privacy, [are] not deemed sufficiently culpable to

20   brand the applicant as someone who lacks good moral character." *Id.*; *see also United*

21   *States v. Hovsepian*, 422 F.3d 883, 887-88 (9th Cir. 2005) (noting that statements made

22   due to "faulty memory, misinterpretation of a question, or innocent mistake" have no

23   bearing an applicant's character for truthfulness and do not prevent the Court from finding

24   good moral character).  However, "unlike the misrepresentation clause of § 1451(a), the

25   false testimony provisions of § 1101(f)(6) do not apply to 'concealments.'" *Kungys*, 485

26   U.S. at 781; *see also Hovsepian*, 422 F.3d at 887-88 (affirming the holding of the district

27   court as not clearly erroneous, which found the applicant to be a person of good moral

28   character within the meaning of 8 U.S.C. §§ 1101(f) and 1427(a)(3) despite inaccuracies

-36-

in his testimony).   "Whether a person has the subjective intent to deceive in order to obtain immigration benefits is a question of fact."   *See Hovsepian*, 422 F.3d at 887-88; *see also Newton v. Nat'l Broad. Co.,* 930 F.2d 662, 670 n.12 (9th Cir. 1990) ("A state of mind issue such as actual motive is a 'pure question of fact' normally subjected to review under the 'clearly erroneous' standard.").

There is no disputing Petitioner provided false testimony during his September 10, 2018 interview.   There were also many inconsistencies among the record, Petitioner's testimony at the September 10, 2018 interview, Petitioner's testimony at the October 30, 2019 interview, and Petitioner's testimony at the trial in this matter.   However, there is also no disputing that many of the questions posed by USCIS lacked foundation and assumed facts not in evidence, such that they proved to be misleading or intended to elicit incorrect responses.   Even if those questions intended to elicit false answers, the issue with the instant application is not whether Petitioner's testimony was false (some of it was) but whether it was (1) intentionally false; and (2) for the purposes of obtaining an immigration benefit. *See* 8 U.S.C. § 1427; *see also* 8 U.S.C. § 1101(f)(6); 8 C.F.R. § 316.10(b)(2)(vi); JCMS at 3:16-22.   Respondent accuses Mr. Elhassani of giving five categories of intentionally false testimony, which relate to whether (1) he had contact with Moussa after Moussa left GWG and departed the U.S.; (2) he transferred money to Moussa after he ceased working GWG and left the U.S.; (3) his brothers were involved with ISIS; (4) he knew that Moussa, Abdelhadi, and Samantha went to Syria; and (5) he was indirectly associated with ISIS.

Although Petitioner has an explanation for every inconsistency, the Court finds it difficult to believe that so many inconsistencies over such an important matter can result from an intent to tell the truth.   The Court acknowledges that if Petitioner did intentionally lie about knowing his brothers had joined ISIS and/or been killed, he did so only because he believed it would look bad or jeopardize his ability to become a citizen, not because he supported his brother's actions.   Unfortunately, good moral character involves honesty regarding all matters, including matters that one believes would look bad or might jeopardize one's ability to become a citizen.   As set forth below, the Court finds that

-37-

Petitioner provided intentionally false statements for the purpose of obtaining an immigration benefit on the below topics.

**1.** ***Intentional False Statements Regarding Contact with Moussa After He Left GWG and Departed the U.S.***

At the September 10, 2018 interview, Petitioner provided the following testimony regarding whether he had contact with Moussa after he had left the U.S.:

> Q: Did they ever contact you while they were outside the U.S.?
> A: I never talked to them.
>
> Q: Did they write you any texts or emails?
> A: I may have seen a group email that was sent to the family but I don't recall exactly.
>
> Q: Did they mention where they were or where they were going?
> A: I honestly don't recall. At the time I was upset that they just took off and left. We were counting on them to do the work around the warehouse. So that made us not want to talk to them.

Transcript I at 42. USCIS argues that Petitioner provided intentionally false testimony under oath with the subjective intent of obtaining an immigration benefit, *i.e.*, naturalization, when he testified that he did not have contact with Moussa and Samantha after they departed the U.S. Decision at 84. It elaborates that he stated that "the only communication he received from Moussa was 'an email from them like on a holiday just sent it a mass email to everybody in the family but nothing to me personally' is an intentional oral false statement under oath." *Id.* However, Petitioner exchange several e-mails with Moussa alone regarding the accounting. *Id.*

Respondent originally found incredible Petitioner's assertion in his original interview and sworn-declaration that at the time he received the April 2015 e-mails from Moussa, he had no idea that Moussa, Samantha, and/or Abdelhadi had left the U.S. Decision, ECF No. 13-2 at 84, 90-92. The Court finds that Moussa's April 2015 e-mails

-38-

contained no explanation as to where he was at the time.  In the e-mail, Moussa asks Petitioner not to include Atlasmart income after March 23, 2015, stating, "I haven't helped with orders[,] but I did bring 3 pallets of items to the small warehouse," which "should keep them listing for a month."  CAR, ECF No. 13-3 at 15.  To the extent Moussa's comments suggest he may have stopped working by asking Petitioner to exclude income after March 23, 2015, as he had not helped with orders, they equally suggest he was continuing to work by simultaneously discussing bringing in pallets to keep items listing for the coming month.  In fact, the same e-mail states, "I *am* helping as much as possible," and "*[w]e are* only selling on Amazon low ticket items that are very simple to fulfill and no one wants to returns."  CAR, ECF No. 13-3 at 16.  The use of the present tense gives no indication that Moussa is no longer working for Petitioner.  Thus, this e-mail does not conclusively indicate Moussa had resigned or left the U.S.  Although March 22, 2015 ended up being the date Moussa and Samantha left the U.S., there is nothing in the record, beyond speculation, to prove Petitioner knew that they left the U.S. on that date.  At the October 30, 2019 interview, Petitioner stated that he realized they left around the third week of April, after speaking with Yassine.  Transcript II at 4.  During the hearing, Petitioner again testified that he stated he had no contact with his brothers after they left the U.S. in his original September 10, 2018 interview because he was unaware, until after the interview, that they were not in the U.S. when they exchanged e-mails in April 2015.  *See TT* at 31:24-32:4, 120:24-122:14.  When asked whether Moussa's request to not include accounting after March 23, 2015 caused him to suspect Moussa had resigned or left the U.S., Petitioner testified that he did not pay attention to that as he was more focused on Moussa's comments about the Amazon account being suspended.  *Id.* at 35:8-23.

Before an item of evidence may be considered, Federal Rule of Evidence 901(a) requires a proper foundation be laid to authenticate the item by "evidence sufficient to support a finding that the item is what the proponent claims it is."  *See Canada v. Blain's Helicopters, Inc.,* 831 F.2d 920, 925 (9th Cir. 1987).  Such a foundation may be laid by testimony of a witness who has personal knowledge.  FED. R. EVID. 602, 901(b)(1).  Here,

Respondent failed to lay the foundation to establish that Petitioner lied about having contact with Moussa.  Had Respondent established that Petitioner knew Moussa departed the U.S. on March 23, 2015, then his testimony denying contact with Moussa could be proven as intentionally false testimony in light of the April 2015 e-mails.

Later, the interviewer asked Petitioner, "What about your brother Yassine[,] who looked after their property, what was his understanding about what he was supposed to do for Samantha and Moussa?" Transcript I at 43.  Petitioner responded, "It was just that after they had been gone for a few days … Yassine started to look after their property." *Id.*  The USCIS Decision notes that because Moussa and Samantha left on March 22, 2015, "[e]ven if Yassine was in fact the person who first informed you of their departure, it is not credible that Yassine, as a brother and employee of your wife's company, would have waited one month before he informed you Moussa and Samantha had left."  Decision at 91. Respondent argues that if it was only a few days after they left that Yassine started to look after Moussa's property (*i.e.*, sometime in late March 2015), then, it is not credible for you to claim that Yassine did not tell you they left until after your April 2015 e-mails with Moussa, especially given Yassine also worked for GWG.  *Id.*  However, Respondent again did not ask Petitioner when Yassine told Petitioner that he learned Moussa and Samantha left.  At the hearing, Petitioner testified that "[a]fter the 17th (*i.e.*, April 17, 2015), that weekend[,] I remember talking to my brother Yassine, and he told me that he hasn't seen them in a few days." TT at 43:24-44:1.  Thus, even though Moussa and Samantha left on March 23, 2015, it appears Yassine did not discover this and inform Petitioner until after Petitioner had finished e-mailing with Moussa regarding the accounting and transferred the amounts Moussa had been owed for his work for Atlasmart.

The USCIS Decision also stated that "[i]t is also implausible that your wife, as owner of the warehouse where Moussa and Samantha worked, would not have known—and immediately informed you—that your brother Moussa and sister-in-law Samantha failed to report for work at the warehouse on our around March 22, 2015." Decision at 91. However, Petitioner consistently testified at the September 10, 2018 interview, October 30,

2019 interview, and August 30, 2021 hearing that Moussa and his wife were independent contractors who were not responsible for clocking in and clocking out.  Transcript I at 42; Transcript II at 5-6; TT at 28:16-22.  Thus, as independent contractors, who had no duty to clock in or clock out, their lack of doing so would not necessarily have triggered cause for concern.

At the hearing, Petitioner testified that once Yassine told him Moussa had left, Petitioner "started calling him and texting him."  TT at 44:24-45:3; *but see* Transcript I at 42 ("I never talked to them").  He stated that he never e-mailed him to ask where he was because they usually only e-mailed for business but texted and called for personal conversations, which is why he texted and called Moussa numerous times without a response.  *Id.* at 44:24-45:16.  Petitioner also explained that this was not the first time Moussa had disappeared as he struggled with drug addiction and would relapse and disappear from time to time.  *Id.* at 45:18-25.  He also stated that Moussa and Samantha had been talking about trips to Florida, and Samantha had family in Oklahoma, so he thought they might have been in Florida or Oklahoma.  *Id.* at 46:1-11.

The record shows that Moussa sent an e-mail on August 20, 2015, to his family, including Petitioner, which does not indicate where Moussa was at the time he sent it but strongly suggests wherever he was, it was not in the U.S.  CAR, ECF No. 13-3 at 17-20.  While Petitioner's initial response of "I never talked to them" was false, he clarified and admitted to the August 20, 2015 e-mail.  Transcript I at 42.  However, "see[ing] a group email," *see* Transcript I at 42, is different from "responding to a group e-mail," directly addressing the response to Moussa and even offering to go into business with him, *see* CAR, ECF No. 13-3 at 17-20.  At the hearing, Petitioner offered clarification for why he said he had not had contact with Moussa:

> [W]hen I denied the fact that I never heard from them, I believe it was referring to … that I may have seen a group family e-mail sent from Moussa to the entire family.  I did not mean that he sent me a contact directly, because they never did.  They never sent me—an e-mail personally directly or call me directly.

TT at 104:1-7.

While the Court finds this explanation and definition of "contract" evasive, even giving Petitioner the benefit of the doubt and believing his aforementioned explanation, this does not explain his repeated testimony at hearing that he sent Moussa texts and called him repeatedly after realizing he disappeared. *See, e.g.*, TT at 45:14-16 ("To me, the most urgent thing to do was just send him a text and call him. And we called again and again and there was no answer from him."). On the one hand, the Court bears in mind that the interviewing officer asked Petitioner, "Did they ever contact *you* while they were outside the U.S.?" as opposed to "Did you ever have contact *with* Moussa while he was outside the U.S.?" or "Did you *ever attempt to contact* Moussa while he was outside the U.S.?" Had the latter two questions been asked, there could be no denying that Petitioner's hearing testimony that he subsequently texted and called Moussa would prove the falseness of his initial interview testimony. On the other hand, the Court finds Petitioner's response that he "never talked to him" disingenuous and evasive. Petitioner is a well-educated and well-spoken individual. The Court suspects Petitioner had every idea what the USCIS officer intended to ask, and his evasive responses bear on his ability to tell the truth.

Additionally, the Court notes that Petitioner referenced calling and texting Moussa, but no screenshots of text messages or telephone calls were ever provided to the Court. Meanwhile, Petitioner did produce his e-mails, and stated in his Declaration, "From my past criminal history in 2006 and 2007, I am well aware that it is easy for law enforcement to access my personal email" as "[t]he prosecution accessed and used my emails to prosecute me." Applicant Decl. at 150, ¶ 46. Thus, knowing the government could access the e-mails, he produced them all. However, it is curious that Petitioner did not produce any record of his phone calls or texts attempting to contact Moussa, particularly when viewing that omission in light of his testimony that he was angry with his brother for suddenly leaving on the one hand, TT at 82:2-8, against the tone of his August 20, 2015 "reply all" e-mail to Moussa, offering to go into business with him, CAR, ECF No. 13-3 at 17-18.

-42-

The Court finds that while the USCIS officer's questioning lacked foundation and was potentially meant to "trap" Petitioner into providing a false answer, his subsequent testimony at the second interview and hearing attempting to "explain away" his earlier response was not credible and intentionally false, at least with respect to omitting mention of the August 20, 2015 e-mails as well as his texts and calls to Moussa.

### 2. *Intentional False Statements Regarding Money Transfers to Moussa After He Ceased Working for GWG and Left the U.S.*

Respondent also argues that Petitioner provided intentionally false testimony for the purpose of obtaining an immigration benefit when he testified that he did not transfer money to Moussa after Moussa left his employment with GWG and departed the U.S. Decision at 92. At the September 10, 2018 interview, Petitioner denied transferring anything to Moussa after Moussa departed the U.S.:

> Q:    Did you ever transfer money to Abdelhadi or Moussa … ?
>
> A:    [N]o. But when they were contractors the company paid them checks or money transfers[, b]ut since they left the company[,] we did not give them anything. Before they left[,] I may have transferred money to them.

Transcript I at 42-43. There can be no disputing that this was a false statement given Moussa and Samantha departed the U.S. on March 22, 2015, and Petitioner transferred funds to Moussa on April 6, 2015 and April 13, 2015. Decision at 94. Again, the issue is whether Petitioner knew when he sent his early April e-mails and transferred money, that Moussa had already departed the U.S.

Respondent argues that Petitioner provided "a separate oral false statement concerning the *purpose* of your money transfers to Moussa" because Petitioner testified he transferred the money for Moussa's work, but Petitioner's "oral testimony during [his] N-400 interview regarding Moussa's duties at [GWG] made it appear that he served as a handyman around the warehouse engaging in mowing trees, shoveling snow, and other work around the warehouse," which contradicts his testimony that Moussa was also involved in online sales. Decision at 95-97. Respondent argues this "constitutes evidence

that he intentionally provided oral false testimony under oath for purposes of obtaining naturalization." *Id.* at 96-97.

The Court disagrees that Petitioner provided *intentional* false statements about transferring funds to Moussa after his departure because, as outlined above, Respondent did not establish when Petitioner believed his brother departed the U.S., which would have established the foundation for proving that his denial of transferring funds to his brother after his departure was *intentionally* false in light of his April 2015 transfers. As stated, nowhere in the April 2015 e-mails between Petitioner and Moussa regarding the accounting does Moussa ever state that he left Indiana, much less the U.S. CAR, ECF Nos. 13-2 at 204-09, 13-3 at 13-15. The record confirms that the amount of money transferred to Moussa was the exact amount he was owed under the profit-sharing agreement detailed by Petitioner in his testimony at both of the interviews as well as the hearing (*i.e.*, 30% of the Amazon and eBay sales after deducting expenses for payroll for the W-2 employees and shipping). *See TT* at 28:28-29:6.

The Court notes that when examining the joint bank account from which the funds were transferred, $2,000.00 and $2,135.01 were transferred from an account ending in 0821 on April 13, 2015, into the joint account that Petitioner alleges was used for the Atlasmart business. CAR, ECF No. 13-2 at 183, 185. That same day, the same amounts (*i.e.*, $2,000.00 and $2,135.01) were transferred out of the joint account to Moussa's account. This suggests that the $4,135.01 transferred to Moussa may not have been for Atlasmart earnings and might have been transferred from Petitioner to the joint account, so that he could transfer the funds out of the joint account as a cover. Further, the Court was also unable to locate the February 16, 2015 transfer to Moussa in the bank statements produced, suggesting that perhaps, that transfer did not come from the business account and came from his personal account instead. *See id.* at 173- (showing the February 10, 2015 to March 12, 2015 Bank of America Statement for Petitioner and his wife, which does not show a transfer on February 16, 2015, or even a transfer on one day in February amounting to $1,000.00). However, Petitioner was never questioned on this at his two interviews or the

hearing, and the Court finds that given the substantial amount of back up supporting the fact that the transfers related to Moussa's work, the Court does not find enough evidence in the record to find that Petitioner intentionally lied about the purpose of the transfers.

Rather, the record also confirms that—at least for the months of November 2014 through March 2015—Petitioner paid Moussa and Yassine for two to three months at a time. *Compare* Transcript II at 6 (testifying that "sometimes when sales [are] low I would probably just group one or two months or three months together and do the math") *with* CAR, ECF No. 13-2 at 204-07 (showing an accounting reconciliation for November and December 2014 incomes with Moussa being entitled to $1,556.34 [or net sales of $5,187.89[18] multiplied by 30%]); *id.* at 208-09 (showing an accounting reconciliation for January, February, and March 2015 Quarter 1 incomes with Moussa being entitled to $7,0578.67 [or net sales of $25,262.22[19] multiplied by 30%]). These numbers are supported by the record, which includes support for postage expense amounts, *see* CAR, ECF No. 13-2 at 206 (showing $1,099.70 in shipping expenses for November and December 2014), 209 (showing $3,572.92 in shipping expenses for January through March 2015), as well as a payroll summary, *see id.* at 207 (showing $3,511.87 in payroll from October 15, 2015 through December 31, 2014), 210 (showing $2,829.01 in employee pay for February 13, 2015 through March 31, 2015). The record also includes a 2014 1099 form for Moussa showing $19,287.21 in nonemployee compensation from WLS. *Id.* at 212. Because this amount exceeds the mere $1,556.34 income paid by Petitioner and transferred to Moussa in April 2015 for 2014 earnings, the Court finds the payment to

---

[18]  $9,799.36 (Gross Sales)
- $3,511.57 (Employee Pay)
- $1,099.70 (Shipping Expenses) =
  $5,187.89 (Net Sales)

[19]  $31,664.15 (Gross Sales)
- $2,829.01 (Employee Pay)
- $3,572.92 (Shipping Expenses) =
  $25,262.22 (Net Sales)

1   Moussa is substantiated not just by the backup for the calculations of the amount paid to

2   him but also by the $17,730.87 in additional income paid to Moussa in the year 2014 for

3   his work.

4         Petitioner also testified that "his wife handled the payroll" at the September 10, 2018

5   hearing.  *See* Transcript I at 42, and August 30, 2021 trial, *see TT* at 89:4-18, 92:25-93:3.

6   Respondent attempts to suggest that because Petitioner repeatedly stated that his "wife

7   handled the payroll," there could be no reason for him to transfer money to Moussa.  Courts

8   may look to the dictionary definition of a word, or in this case, idiom, to help determine

9   the plain meaning of the phrase or word.  *See Niz-Chavez v. Garland*, 141 S. Ct. 1474,

10  1484-85 (2021).  "Payroll" is defined as, *inter alia*, "[a] list of employees to be paid and

11  the amount due to each of them," or "[a] business's financial records of employees' wages."

12  Garner, Brian A., PAYROLL, Black's Law Dictionary (11th ed. 2019).  Thus, on the one

13  hand, Petitioner's consistent testimony that his wife handled the payroll for the W-2

14  employees does not cast doubt onto the reason for him transferring Moussa money given

15  Petitioner also constituently testified that his brothers, Moussa and Yassine, were

16  independent contractors rather than employees.  Generally, independent contractors are not

17  part of a "payroll," so they would not be part of the payroll handled by his wife.  However,

18  at the September 10, 2018 interview, Petitioner was asked whether he or his wife

19  transferred money to Moussa or Samantha since they stopped working with GWG and

20  responded, "I do not really recall.  I did not handle payroll."  Transcript I at 43.  If his

21  brothers were independent contractors, as he testified, then, it appears his wife handling

22  payroll did not impact his ability to tell the USCIS officer whether Moussa had been paid.

23        Petitioner also testified at the September 10, 2018 hearing that "when they [Moussa

24  and Samantha] were contractors[,] the company paid them checks or money transfers."

25  Transcript I at 42.  At trial, when confronted about why he would wire transfer money to

26  Moussa in April 2015 if Moussa was paid by check, he testified that he and his wife used

27  dedicated accounts for GWG's Amazon and eBay sales, and they would mostly send wire

28  transfers, so he was unsure if they were writing checks.  TT at 93:8-17.  The Court finds

-46-

this to be a minor inconsistency given his testimony at the first hearing where he said the contractors were paid by "checks *or money transfers*." Transcript I at 42 (emphasis added). Although Petitioner's false statements or inconsistencies thus far did not qualify as intentionally false statements preventing a finding of good moral character, two additional major inconsistencies do demonstrate that Petitioner provided intentional false statement to gain an immigration benefit.

First, as stated, the record shows a 2014 Form 1099 for Moussa showing $19,287.21 in nonemployee compensation from WLS. CAR, ECF No. 13-2 at 212. Yet, at his September 10, 2018 interview, Petitioner testified that Moussa "was a contractor for GWG." Transcript I at 41. In his February 25, 2019 declaration, he tried to explain this discrepancy by stating that even though Moussa's Form 1099 was issued by WLS, the work he performed was around the warehouse, which both WLS and GWG shared. Applicant Decl. at 148, ¶ 35; *see also* TT at 25:3-9 (testifying that Moussa "was working as an independent contractor at one of my companies …. Global Warehousing Group and World Logistics"). However, Petitioner also testified that WLS has W-2 employees, and his wife does the payroll for those employees, who get paid twice a month, while he takes care of the independent contractors, which were mainly his two brothers, and who were paid on a profit-sharing basis from the sales of GWG. TT at 89:4-18; *but see* Transcript I at 42 (testifying that his brothers were paid "[o]n a 1099 basis," and that his "wife handled the payroll" when asked "[h]ow did you pay for their salaries?"). Given Petitioner clearly testified that his brother was an independent contractor and ***not*** an employee in both of his interviews as well as at the hearing, *see* Transcript I at 41; Transcript II at 5-6[20]; TT at 25:3-9, it is unclear why WLS, which paid the employees, would issue a Form 1099. The Court

---

[20]     While at one point in the October 30, 2019, Petitioner stated that Moussa "worked for me" and "was my employee," Transcript II at 3, his description of Moussa during that same interview of Moussa setting his own hours without being required to clock-in or clock-out suggest that this was merely an accidental use of the wrong term given he consistently testified in his September 10, 2018 interview and August 30, 2021 hearing that Moussa was an independent contractor.

1  suspects that this is simply a case of two interrelated companies not maintaining enough
2  corporate separation. Given the substantiation behind the exact money amounts transferred
3  to Moussa as well as the back-up for the amounts transferred to him, the Court does not
4  find that Petitioner transferred the amounts to Moussa in an attempt to fund ISIS.

5         On a related note, Respondent argues that "[u]nder the circumstances, it appears that
6  Petitioner may have been using Global Warehousing and the email communications as a
7  cover to send money to Moussa." RFFCL at 22:18-19. It points out that Petitioner knew
8  the government could access his e-mails. *Id.* at 22:19-24; *see also* Applicant Decl. at 150,
9  ¶ 46. Respondent suggests that because Petitioner testified that GWG dissolved in 2015,
10  he may have used the dissolved entity to transfer funds to Moussa as a cover to fund ISIS.
11  RFFCL at 22:24-23:3. However, at his September 10, 2018 interview, Petitioner stated
12  that GWG "ceased operations in 2015," although he could not "recall the month."
13  Transcript I at 40. Secretary of State records show that GWG was administratively
14  dissolved on April 16, 2015, after transferring the funds to Moussa. *See*
15  https://bsd.sos.in.gov/PublicBusinessSearch/BusinessInformationFromIndex. Thus, at the
16  time Petitioner transferred funds to Moussa, GWG had not yet been dissolved. *Id.*
17  Accordingly, the Court does not find that the fact of the transfer being from GWG proves
18  that Petitioner intended to lie about the funds being for Moussa's services rendered.

19         Second, Petitioner testified very inconsistently regarding Moussa's duties. At his
20  September 10, 2018 interview, Petitioner described Moussa's job duties as including
21  "doing work around the warehouse and shoveling snow with a truck." Transcript I at 41.
22  At the October 30, 2019 interview, he expanded on Moussa's duties saying that he also
23  broke pallets, put pallets together, pulled boxes, put boxes together, brought overstocked
24  items from one warehouse to another, and got them listed on eBay and Amazon to sell.
25  Transcript II at 7, 21:12-22:11; *see also* CAR, ECF No. 13-3 at 19 (describing in Moussa's
26  August 20, 2015 e-mail that one of the many reasons he left the U.S. was major spine
27  "problems from working in the cold[,] lifting heavy stuff (heavy boxes, lifting garage
28  doors, pallets, attaching and detaching towing trailers, shoveling snow"). At the August

30, 2021 hearing, Moussa's duties were described as expanding further still to the point that he suddenly became a supervisor and manager. *See TT* at 87:25-88:2 ("Q. So you're saying now that your brother Moussa, was a supervisor at the warehouse? A. Yes. He had employees that he was supervising."). Petitioner elaborated:

> Q.    … I'm just asking you why were angry with your brother for having left when all he did was bill you for work that he had done when he was at the warehouse …. He didn't try to bill you for anything he did after he left; correct?
>
> A.    Yeah. The reason I was angry with him, I'm living here … in California. He lives in Indiana. He was managing. He had employees working under him. He was supervising them. He was the manager of that little warehouse, and he was responsible for moving boxes from World Logistics' warehouse to the warehouse next door to sell on Amazon and eBay. And he had so many responsibilities. That, also including doing maintenance inside and outside the warehouse. He … had really a lot of responsibility. So I was angry with him for just picking up and leaving and leaving us hanging with employees that no one is supervising. And that's the main reason why I said I was angry with him.

TT at 87:6-24.

In other words, initially, Petitioner testified that his brother was performing manual labor, but once he was questioned about transferring money to his brother, the Court concludes he changed his testimony to increase Moussa's level responsibility as an attempt to justify why he transferred money to Moussa.

Finally, as shown by the below accounting, even though the accounting reflects that Moussa was owed a total of **_$9,135.01_**, Petitioner never transferred the full amount owed to Moussa:

| Atlasmart Quarter: | Moussa's Owed Income: |
|---|---|
| **November, December 2014 Q4 Income:** | $1,556.34 |
| **January, February, and March 2015 Q1 Income:** | $7,578.67 |
| **TOTAL:** | **$9,135.01** |
| **Advances Already Paid:** | |

| February 16, 2015 (Advance on Profits): | ($2,000.00) |
|---|---|
| April 6, 2015 (Amount Transferred at Moussa's Request): | ($1,000.00) |
| April 12, 2015 (Partial Payment of Amount Owed): | $4,135.01 |
| **Remainder to be Transferred:** | **$7,135.01** |
| **Balance Owed:** | **$2,000.00** |

CAR, ECF No. 13-2 at 183, 185; ECF No. 13-3 at 13-14.   When asked why he only transferred part of the balance owed to Moussa, Petitioner testified that he only transferred part of the balance owed because "cash flow was low at the time," and he "knew it was right around tax payments season … and … needed to make large payments for [his] taxes before the April 15th deadline."  TT at 40:20-24.  He stated that he "paid him as much as [he] could and left a rounded amount to remember, $2,000, and … told him that [he] would transfer it the following Monday."  *Id.* at 40:24-41:2.  Petitioner made the $4,135.01 transfer on Monday, April 13, 2015, meaning the following Monday was April 20, 2015.

When questioned at his October 30, 2019 interview about the above transfers,[21] Petitioner testified that he never transferred the $2,000.00 balance because "as soon as [he] heard they disappeared," he "didn't send Moussa his last payments."  Transcript II at 4, 6. This aligns with his other testimony that he learned about Moussa's departure "after the 17th (*i.e.*, April 17, 2015)," TT at 43:24-44:1, and explains why the transfer, which was set to be made on April 20, 2015, was never made.  *But see* RFFCL at 22:8-11 (suggesting that the final installment was never paid because Petitioner likely attempted to transfer the money, but Moussa was already in Syria and unable to receive bank transfers).

When asked about his reasoning for refraining from transferring Moussa the money if he was owed that amount for his work regardless, at first Petitioner testified that he did not contact Moussa further because he was mad at him.  TT at 83:11-23.  Yet, at the first sign of communication from Moussa, on August 20, 2015, Petitioner—who claimed to be angry with Moussa for leaving without explanation—replied all to the family e-mail chain,

---

[21]   The e-mail chains discussing the amounts owed and accounting had not been discussed at the September 30, 2018 hearing, so there is no testimony regarding the dates and amounts of transfers from that hearing.

suggesting that he and Moussa go into business together. *Id.* at 53:1-5. This conflicts with his own testimony that he was upset with his brother and thought he was a lost cause. *Id.* at 81:9-82:1. When pressed on why he would want to go into business with someone he was so angry with, Petitioner stated that he sent this e-mail at his mother's encouragement because she had been pleading with Petitioner to encourage Moussa to move back to Morocco. *Id.* at 123:3-20. Later, when questioned further as to why he would not transfer Moussa amounts he was, in fact, owed, Petitioner testified that he refrained from making the final transfer because "if I don't make … the transfer, [Moussa] will probably try to reach out to me again asking for that money." *Id.* at 43:9-21. In other words, he claims it was a way to provoke contact from Moussa.

The Court disagrees with USCIS' conclusion that Petitioner transferred funds to Moussa either knowing Moussa was outside of the U.S. or intending to fund ISIS. However, the Court finds that Petitioner's subsequent false or inconsistent testimony at his October 30, 2019 interview and August 30, 2021 hearing was not credible. Petitioner appears to have exaggerated Moussa's role for WLS or GWG in order to attempt to post hoc bolster his reasons for transferring Moussa money. Further, although the Court finds that nothing in the record suggests Petitioner knew—as opposed to *suspecting* Moussa may have been in Turkey in August 2015—where Moussa was when he made the transfers, the inconsistency between saying Petitioner failed to make the final transfer because he was upset with Moussa for abandoning their business and offering to start a new business with Moussa as soon as he heard from him suggest that perhaps, Moussa did respond to some of those phone calls or texts Petitioner sent Moussa. Thus, the Court finds that Petitioner made intentional false statements regarding Moussa's job duties.

### 3. *Intentional False Statements Regarding Suspicions of Abdelhadi's Affiliation with ISIS*

USCIS argues that during his N-400 interview, Petitioner provided intentionally false testimony about his brothers' affiliation with ISIS. Decision, ECF No. 13-2 at 97. At his September 10, 2018 interview, Petitioner testified that he had no reason to know or

-51-

suspect his brothers had any involvement with ISIS.  First, when he was asked, "do you know why your brothers might have wanted to go and fight for ISIS?," Petitioner testified that his brothers "never told us they were planning to go and join any organization," Transcript I at 43.  Second, even though Petitioner acknowledged that he eventually heard they went to Turkey, which is close to where ISIS was operating, he stated that he "may have suspected something at some point, but nothing concrete," and "when they were here, they never showed any feelings or any desire to join any organization[,] [s]o, when they left for Hong Kong, it was just sudden."  ECF No. 14 at 68-69.  Third, Petitioner also testified that based on his brothers' lifestyles, "they were not the typical person who sympathizes with those organizations," as "[t]hey were not practicing, you know, religion." *Id.* at 69.

Respondent argues that Petitioner's e-mail to Abdelhadi asking not to be included on e-mails about ISIS, the Sunna, the Shi'ia, etc., demonstrates the falsity of his testimony about not having reasons to suspect his brothers would join ISIS.  Decision at 97-98.  It contends that this evidence suggests Petitioner was "aware that [his] brother Abdelhadi had radicalized and that [he was] concerned that his interest in ISIS could cause trouble for [him]." *Id.*  It also points out that Petitioner's e-mail to Abdelhadi "warning that he should not include [Petitioner] on any email messages 'regarding ISIS'" was sent "*fifteen days before* Moussa and Samantha left their jobs at your wife's warehouse and departed the United States with their children, and *twenty-two days before* Abdelhadi departed the United States." *Id.*

In response to the Notice of Intent to Deny's accusation that his e-mail showed he had reason to suspect Abdelhadi had radicalized, Petitioner submitted a declaration explaining that "Abdelhadi had a habit of sending group emails about topics of interest to him at any given time."  Applicant Decl. at 149, ¶ 40.  Indeed, the record contains evidence that on February 10, March 23, April 4, and June 14, 2014, Abdelhadi sent e-mails not just to Petitioner but to various other family members regarding a variety of topics including Facebook ad revenue, GMOs and their danger to children, the coral reef, and watching

-52-

1  World Cup games online on ESPN 3.  CAR, ECF No. 13-2 at 214-221.

2        Petitioner stated that although he did not recall when, "at some point, [Abdelhadi]

3  started sending emails about Muslim religious groups, including fundamentalists," but "as

4  was [Petitioner's] habit, [he] did not read them."  Applicant Decl. at 149, ¶ 41.  He states

5  that while he was not worried about Abdelhadi becoming radicalized from those e-mails at

6  the time, with hindsight, he realizes he was wrong.  *Id.* at 149, ¶ 42.  He explained that the

7  reason he e-mailed Abdelhadi to ask him to stop sending e-mails about religious groups

8  was because "[f]rom [his] past criminal history in 2006 and 2007, [he was] well aware that

9  it is easy for law enforcement to access [his] personal email" as the prosecution had used

10  his e-mails against him.  *Id.* at 150, ¶ 46.  As a result, he stated that he "did not want

11  anything in [his] email to suggest that [he] was interested in Abdelhadi's emails" and was

12  concerned about "the appearance that [he] was involved in any religious or sectarian

13  groups."  *Id.* at 150, ¶ 47.

14        Respondent argues that Petitioner's "assertions in [his] February 25, 2019 sworn-

15  declaration, … are materially inconsistent with [his] September 10, 2018 N-400 oral

16  testimony."  Decision at 97.  It contends that his testimony that his brothers did not practice

17  religion and were not the types of persons to sympathize with ISIS is contradicted by his

18  e-mail to Abdelhadi asking him to stop sending e-mails regarding ISIS.  *Id.* at 97-98.  It

19  argues that as a result, Petitioner made an intentional false statement for purposes of

20  obtaining an immigration benefit because "[t]he evidence suggests that [he was] concerned

21  that [his] association with [his] brothers Abdelhadi and Moussa, as well as [his] money

22  transfers to Moussa, would render [him] ineligible for naturalization."  *Id.*

23        At the September 30, 2018 interview, Petitioner stated that "[t]heir life-style was not

24  typical of someone who would join those organizations."  Transcript I at 43.  He continued

25  saying that "[t]hey[22] did not practice religion."  *Id.*  The interviewer commented that

---

26

27  [22]    At the hearing, Petitioner was questioned regarding the fact that he said that "**they**
28  did not practice religion," Transcript I at 43 (emphasis added), but that Petitioner also

Petitioner did not seem surprised at hearing the news that Moussa and Abdelhadi had joined ISIS, and Petitioner responded that "[a]fter they went to Hong Kong[,] we heard rumors that they went to Turkey and just by the close proximity we thought maybe they might have gone to join some of those organizations."  *Id.*  He stated that they "were suspecting that it was a possibility."  *Id.*  At his October 30, 2019 interview, when asked about his previous testimony of "suspecting that it was a possibility," Petitioner stated that he "suspected they may have gone over there because someone asked them to come or join some religious group," but he "did not exactly know which group or if they were just religious or fundamentalists or militant."  Transcript II at 10.

When asked about Moussa specifically, Petitioner has been steadfast in reiterating at both interviews and the hearing, that he had no reason to suspect that Moussa—a drug user living a life of luxury, including BMWs and Dodge Vipers—would ever become involved with ISIS.  Transcript I at 43; Transcript II at 10; TT at 108:20-109:2.  At the hearing, he reiterated that when he learned of Moussa's disappearance, it never crossed his mind that Moussa would have joined a fundamentalist or terrorist groups because he never showed any signs that would suggest that.  TT at 53:11-20.  Indeed, the government has admitted in the subsequent case brought against Samantha related to aiding and abetting ISIS that it has "little or no documentation of Moussa's support of ISIS's ideology or the Caliphate before they moved to Syria."  *Elhassani II*, 2020 WL 7230627 (N.D. Ind. Sept. 4, 2020).

When asked about Abdelhadi, however, Petitioner acknowledges that he had suspicions he was becoming more religious but did not suspect he would join a militant group.  Transcript I at 43; Transcript II at 10; TT at 53:21-54:4, 108:20-109:2.  He stated that Abdelhadi was going to turn thirty in 2015, was working as a software engineer, had

_____

acknowledged that Abdelhadi had shown signs of becoming increasingly more religious. Petitioner testified that at the time of the interview, he "didn't pay exact attention if he said which of my brothers."  TT at 69:14-70:1.  He also testified that English is his third language, and as such, he often confuses his past tense and pronouns.  *Id.* at 115:10-116:2.

a master's degree, and earned a six-figure income, so he could not fathom how someone like that would leave to join a militant group. TT at 96:21-97:1; *see also* Transcript II at 10 (same). Yet, in *Elhassani II*, the government stated that Abdelhadi was "[t]he only member of the conspiracy who openly discussed his support for ISIS before traveling to Syria." 2020 WL 7232419; *see also id.* at 2020 WL 7230627.

The Court finds that the record supports Petitioner's testimony that Abdelhadi was the type of person that frequently forwarded e-mails regarding a variety of topics to those in his address book. On the one hand, Petitioner's March 7, 2015 e-mail clearly states that Petitioner does not want to be sent information regarding those organizations. CAR, ECF No. 13-3 at 9. That he would refer to those organizations as a "waste" of time suggests he also did not support or sympathize with their beliefs. On the other hand, Petitioner's March 7, 2015 e-mail seemingly came out of nowhere (*i.e.*, it was not in response to some e-mail sent by Abdelhadi), which suggests some event—whether a phone call, text, or e-mail from his brothers or even news about them from someone else—that triggered Petitioner to send his e-mail to Abdelhadi asking him to stop forwarding religious e-mails. This is bolstered by the fact that Petitioner's declaration acknowledges he knew the government could access his e-mail and would likely see his e-mail to Abdelhadi.

Thus, the Court disagrees with the USCIS decision that Petitioner provided intentional false testimony when he stated that his both of his brothers had nothing to do with ISIS. The record does not include evidence suggesting Petitioner knew of Moussa's involvement with ISIS, and if Petitioner had been aware of either brother's involvement, the Court suspects the government would have spoken with him by now. *See TT* at 56:12-14. However, the Court does find Petitioner's testimony that he never suspected Abdelhadi would join a militant group, or even ISIS specifically, is not credible and is intentionally false. The Court finds that Petitioner "bent the truth" regarding his suspicions about Abdelhadi because he believed if he had been honest about his suspicions concerning Abdelhadi, it would jeopardize Petitioner's Application.

>     **4.** ***Accused Intentional False Statements Regarding Petitioner's***

*Knowledge that Moussa, Abdelhadi, and Samantha Went to Syria*

USCIS accuses Petitioner of making intentional false statements when he testified that he was unaware of where Moussa, Samantha, and Abdelhadi were living other than rumors based on a phone call with parents that they were going to Turkey.  Decision at 91.

At the September 10, 2018 interview, October 30, 2019 interview, and August 30, 2021 hearing, Petitioner reiterated that he while he did not know for sure where his brothers went, he had heard they may have gone to Hong Kong and were potentially planning to go to Morocco or Turkey afterwards.  Transcript I at 42; Transcript II at 5, 7 (elaborating that in May or June 2015, he may have heard from his parents that they may have left Hong Kong and were thinking of going to Turkey); TT at 100:17-101:12 (testifying that at the time of the initial interview, he thought Moussa may have been living in Turkey, and that he later heard from his parents that they might pass by Turkey on their way back to Morocco).  The USCIS Decision states, "Your testimony affirmatively obfuscated the truth of the matter which was that on August 20, 2015, Moussa emailed you *personally* as the primary recipient (with other family members copied on the email) and disclosed that he and Abdelhadi were in Syria."  Decision at 91.  USCIS argues that "once [Petitioner] acknowledged that they 'were thinking of going to Turkey', [he] also gave false and/or misleading information by failing to also acknowledge the fact that on August 20, 2015 Moussa *personally* emailed [him] (copying other family members) and identified his location in unmistakable terms that he was in Syria, not Turkey."  Decision at 98.  The Court disagrees.  Nothing in the August 20, 2015 e-mail disclosed where Moussa, Samantha, and Abdelhadi were living.   To the extent the e-mail suggests they were in Syria, as outlined below, it equally suggests they were not in Syria.

The August 20, 2015 e-mail was not just a personal e-mail to Petitioner and it did not explicitly state where Moussa was or where he was going.  CAR, ECF No. 13-3 at 17-20.  In fact, the e-mail stated that Moussa's family (1) should not worry about the war, when if he had been in Syria, the war would likely be a concern; (2) assured that he was not involved in the war, also suggesting Moussa was neither in Syria nor fighting for ISIS;

-56-

and (3) indicated his support for Americans, which also suggests he was not involved with ISIS.  *Id.*  In fact, USCIS acknowledges that "Moussa never mentioned Syria by name," but argues that "there could be no mistake that he was identifying their location as Syria based on the fact that Moussa referenced the 'ongoing war' and assured you that he had nothing to do with this 'ongoing war' and had seen no sign of it."  Decision at 99. Respondent contends that "[i]t was also abundantly clear that Moussa was identifying Syria as his location when he referenced media hype about the ongoing war, his hope that the borders would soon open up, as well as his hope to 'get rid of Bashar', the well-known president of Syria."  *Id.*

The Court does not find that Petitioner made an intentionally false statement regarding whether he knew where his brother was living based on an e-mail that Respondent acknowledges never mentions where Moussa was.  The e-mail does state, "Please don't be mad at us for leaving … soon the borders will open up … new American president and … they will get rid of bashar and things will become even better."  CAR, ECF No. 13-3 at 22.  However, this does not prove Moussa was in Syria given that in 2015, Turkey, Lebanon, and Israel had also closed their borders.  *See* Beth Persky, Federica Dell'Orto, *The Return of Asylum Seekers to Unsafe Third Countries in Contravention of the Principle of Non-Refoulement*, Fed. Law., May/June 2020, at 15, 16 (noting that "[t]o manage the migrants, Turkey has closed its borders to Syrian refugees," which has been in place since 2015); E. Tendayi Achiume, *Syria, Cost-Sharing, and the Responsibility to Protect Refugees*, 100 Minn. L. Rev. 687, 726 (2015) (noting that as of 2015, Israel had closed its borders to Syrian refugees) (citing Michael Kagan, *Must Israel Accept Syrian Refugees?*, 50 T EX. INT' L L.J. F. 1 (2014)); Melissa Phillips, *Refugees and Migrants at Sea: Another View from the Middle East and North Africa Region*, 110 Am. Soc'y Int'l L. Proc. 169, 170 (2016) (noting that "Lebanon imposed strict visa renewal measures and closed its borders in an effort to reduce the number of refugees in its territory"); *see also* https://www.nytimes.com/2015/03    /30/world/europe/turkey-moves-to-close-all-gates-at-border-with-syria.html (noting that "Turkish officials have said that the decision

to keep the crossings closed was necessary because of intelligence pointing to a terrorist plot orchestrated by the government of Syria's president, Bashar al-Assad").  Further, Turkey has been active in condemning Syria's president, Bashar al-Assad, suggesting that Moussa's hope for Bashar's removal could equally suggest he is in Turkey.  *See, e.g.*, Joseph Klingler, *Counterintervention on Behalf of the Syrian Opposition? An Illustration of the Need for Greater Clarity in the Law*, 55 Harv. Int'l L.J. 483, 516 (2014) (noting that "[a]ccording to an October 27 New York Times report, …. Turkey is hosting an armed opposition group waging an insurgency against the government of President Bashar al-Assad") (citing Liam Stack, *In Slap at Syria, Turkey shelters Anti-Assad fighters*, N.Y. Times, Oct. 27, 2011, http:// www.nytimes.com/_2011/10/28/world/europe/turkey-is-sheltering-antigovernment-syrian-militia.html); *but see* Justin M. Ndichu, *"Plugging A Leak": A Preliminary Step in Establishing A Nuanced Approach to Govern Intervention in the New Age*, 49 Cornell Int'l L.J. 201, 215 n.124 (2016) (noting that in 2015, "ISIS … expanded its presence to eastern Syria, where there was large support from several groups opposed to the al-Assad regime, and continues today to increase its prominence in that region") (citing Liam Stack, *How ISIS expanded its threat*, N.Y. TIMES (Nov. 14, 2015), http://www.nytimes.com/interactive/2015/11/14/_world/middleeast/isis-expansion.html)).  Thus, the facts relied on by the government to prove the e-mail was sent from Syria do not provide conclusive proof of Moussa's location.  Rather, as with most evidence relied upon by Respondent, the facts cut both ways.

On the one hand, the Court acknowledges that Petitioner never asked Moussa where he was, which potentially suggests he knew or thought he might be in Syria but did not want to admit it.  On the other hand, Moussa's e-mail assures Petitioner there were no signs of the war, and that he and his family were safe, which suggests he was not, in fact, in Syria, which was rife with war at the time.

The Court acknowledges that it was telling for Petitioner to recommend that Moussa "[u]se a Bitcoin wallet when you travel overseas, [because] no one can confiscate that from you." CAR, ECF No. 13-3 at 20.  However, in Moussa's e-mail preceding Petitioner's e-

mail, Moussa discusses how Samantha had items confiscated at the airport in Morocco:

> Going back to morocco was not easy ... Sending money to morocco by wire was impossible since the IRS was gonna take it before it leaves the US. Sam went to morocco to see if taking cash/gold was easy but those guys in the Mohamed V airport were very scary! They went through her luggage like crazy and confiscated many many things! I was not about to go and have them confiscate the Porsche money and give me a receipt instead!!

CAR, ECF No. 13-3 at 22. This supports Petitioner's testimony at his October 30, 2019 interview, during which he testified that he "was just trying to help [Moussa] not to get his money stolen when he was traveling because [he] knew the whole reason was in conflict." Transcript II at 12. He elaborated that he recommended Bitcoin because he was "familiar with Bitcoin," and "it is not something ... people can just come and ste[a]l from you." *Id.*

Finally, much ado was made during the trial over the fact that Moussa's e-mail referenced that he and Samantha "live in what they call the reef," which he explained is "like farmlands far away from any village or city." CAR, ECF No. 13-3 at 18. Petitioner explained why he did not believe this to indicate Moussa was in any particular country:

> Q. And isn't there a place called "The Reef" in Syria?
> A. There is a reef in every country. We have a reef in Morocco. When we say the reef in Morocco, meaning the outback, behind the mountains, the empty lands.
>
> Q. ...[A]re you aware of the fact that there is a place called "The Reef" in Syria?
> A. I don't know about the exact geography of Syria, but my understanding is that there is a reef in every country. Like the reef in the United States would be probably the midlands, like the Midwest, that would be the empty lands.
>
> Q. Have you ever heard of the Syrian province Reef Dimashq?
> A. Dimashq is the capital, so that wouldn't be called "The Reef."

> Q.    Have you ever heard of a province called Reef Dimashq?
> A.    Never heard of it.
>
> ….
>
> Q.    Did you try Googling "the reef" and "Syria," to see what hits you got?
> A.    No.  As I explained, "The Reef" means the country in Arabic.  That's the exact translation.
>
> Q.    So you never tried Googling the words "the reef" and "Syria" and see what the first hit is when you did that?
> A.    No. I never looked up the word "reef," because I understand that it means the country.

TT at 63:14-65:2.

Later, Petitioner reiterated that because he interprets "reef" as a general, rather than specific term, Moussa's reference did not indicate to Petitioner that Moussa was in Syria:

> Q.    To clarify, Mr. Elhassani, when you read "the reef" in the August 20th, 2015 e-mail, what did you interpret that to mean?
> A.    The reef in the language—in the Arabic language literally means countryside.  If you go to Google and just type Arabic to English translation and type the word "reef," you will see a translation saying countryside or—or outback, or something like that.  But that's what it means in Arabic.
> You ask anyone who speaks Arabic, tell them, I'm from the Reef, he really would not know which country you're talking about.  And he'll ask you, Which country, reef of which country?  It just literally means the countryside, that's all.

TT at 114:10-24.

Respondent asks the Court to take judicial notice of the fact that "Rif Dimashq" is a governorate in Syria.  RFFCL at 17:24-18:1.  The Court does so because Petitioner does not dispute this fact as he acknowledge at the hearing that Dimashq was the capital of Syria.  TT at 63:24-64:2.  The Court also acknowledges that there is a Rif region in northern Morocco.  *See* Nora Elmubarak, *How A Fisherman's Murder Revealed Morocco's Police Brutality and Ethnic Discrimination*, Hum. Rts. Brief, Winter 2020, at 106; *see also* Michael Tonry, Catrien Bijleveld, *Crime, Criminal Justice, and Criminology in the*

1   *Netherlands*, 35 Crime & Just. 1, 6 (2007) ("The Moroccans mainly came from the

2   poor rural area called the Rif.").  Further, according to Wikipedia, "Rif" or "Riff," which

3   is written in Arabic as "الريف," https://en.wikipedia.org/wiki/Rif, translates to "country" or

4   "outskirts,"   https://translate.google.com/?sl=auto&tl=en&text=%D8%A7%D9%84%D8

5   %B1%D9%8_A%D9%81&op=translate&hl=en.[23]  Thus, while the Court was unable to

6   locate anything discussing a reef region in Turkey, it was also unable to locate anything

7   contradicting Petitioner's testimony that in Arabic, reef can refer to a countryside or region,

8   suggesting Moussa's use of the term did not prove he was in Syria.

9          Finally, Respondent argues that the Court should find that Petitioner intentionally

10  falsely testified that "[t]hey never went anywhere near that region," when asked whether

11  he knew why his "brothers might have wanted to go and fight for ISIS," Transcript I at 43,

12  because he testified at the same hearing that he "heard rumors they went to Turkey," and

13  Syria is near Turkey.  RFFCL at 18:19-19:2.  Respondent also argues that Petitioner falsely

14  testified that "that he thought Turkey was nowhere near Syria."  *Id.*  However, Petitioner

15  did not, in fact, testify that he was unaware Turkey was near Syria.  In fact, he stated, "I

16  know Turkey was bordering Syria, and from what he said he was in a farmland."  TT at

17  52:1-6.  Instead of what Respondent accused him of stating, he actually testified that he

18  does not follow the news much and did not "think Turkey had a problem with ISIS," which

19  is why he "said [Moussa] never went near the region where ISIS was."  *Id.* at 113:2-10.

20         In sum, although the one can infer that Petitioner had suspicions about his brothers,

21  the Court does not find that he provided intentionally false testimony when he stated at the

22  September 10, 2018 interview that he did not know the location of Moussa, Samantha, their

23  children, and Abdelhadi given the absence of evidence in the record demonstrating he had

24  any definitive information regarding their location.

25  _____

26  [23]      Again, the Court acknowledges the questionable accuracy of electronic translation
    tools but notes that the definition of "reef" has no impact on the Court's decision in this
27  matter given the Court's conclusion that Petitioner's testimony on so many other matters
28  was intentionally false.

5.   *Accused Intentional False Statements Regarding Petitioner's Indirect Association with ISIS*

As stated, Respondent argues that Petitioner failed to qualify pursuant to 8 U.S.C. § 1424(a)(4)(C) because he affiliated with a terrorist organization, and affiliation includes giving or lending money, 8 C.F.R. § 313.1.  As the Court noted above, involuntary affiliation with an organization described in 8 U.S.C. § 1424(a) does not disqualify a person from naturalization.  8 U.S.C. § 1424(d); *see also* 8 C.F.R. § 313.3(d).  USCIS contends that "the evidence establishes that you are affiliated with the tier 1 terrorist group ISIS as evidence by the fact that on March 7, 2015, you personally emailed your brother Abdelhadi (and copied Moussa) warning him to stop emailing you regarding the subject 'ISIS group.'"  Decision at 100-101.

Respondent also contends that Petitioner "intentionally provided false testimony during [his] September 10, 2018 N-400 interview when [he] orally answered "no" to the question on the N-400 application 'have you ever been a member of, or in any way associated (either directly or indirectly) with a terrorist organization.'" Decision at 100.  It argues that the evidence demonstrates that (1) his "brother Moussa personally contacted [Petitioner] on August 20, 2015 and disclosed to you that he and Abldehadi were in Syria and pleaded with [him] not to view their departure as being 'against the U.S. or Americans'"; (2) "the national and international news media widely reported that [his] brother Moussa was an ISIS sniper who had been killed in a drone strike in 2017, and that Moussa's step-son was used in an ISIS propaganda video"; and (3) "the national and international news media widely reported that [his] sister-in-law Samantha had been detained by Kurdish forces in Syria and was recently extradited back to the United States with her children where she has being charged with lying to law enforcement prior to her departure from the U.S. and also with providing material support to ISIS."  *Id.* at 100.  Thus, USCIS argues that he intentionally provided false testimony by (1) "affirming [his] answer 'no' to question 10 of the N-400" and (2) testifying "to the immigration services officer that 'just by the close proximity [i.e., Turkey to Syria] we thought maybe they might

-62-

have gone to join some of those organizations." *Id.*

The Court disagrees with the USCIS Decision that Petitioner provided intentionally false testimony regarding his own affiliation with ISIS. Thus, it does not find Petitioner is disqualified from citizenship on the basis of providing intentional false testimony regarding his affiliation with ISIS. Rather, the Court finds that Petitioner's testimony that he was not affiliated with ISIS was truthful.

### 6.   *Intentional False Statements Regarding Moussa's Death*

Respondent argues that "Petitioner likely learned, before the September 10, 2018 interview, that his brother[,] Moussa[,] had died fighting for ISIS in Syria and therefore falsely stated to the USCIS interviewer that he was unaware of Moussa's whereabouts." RFFCL at 15:25-27. Respondent contends that if Petitioner knew of Mousa's death before the September 10, 2018 interview from an article, which would have stated that Moussa died in a drone strike fighting for ISIS in Syria, then, Petitioner also lied to the interviewer about being unaware of his brothers' affiliations with ISIS. *Id.* at 17:11-15.

As noted, the Court has taken judicial notice that the fact of that Moussa having been killed was in the public realm before the date of Petitioner's September 10, 2018 interview. *See* Exhibits 1-3 to Respondent's RJN, ECF No. 22 at 2. Petitioner adamantly denies following the news. TT at 113:2-10.[24] He also testified that he learned that Moussa was killed at the September 10, 2018 interview when the interviewer showed him an article, but that before the interview, he had not seen any news articles on the topic. TT at 54:24-55:11. While the Court does not take judicial notice of the fact that Petitioner read any of the articles that the Court has taken judicial notice of prior to his first interview, it does find Petitioner's testimony that he was unaware Moussa had been killed until the September 10, 2018 interview lacks credibility. Petitioner testified that his parents told

---

[24]    Petitioner testified that after he read the article that was shown to him at the interview for his naturalization, he was curious, and only then did he begin searching internet "researching whatever was on the web at the time" while at the hospital with his wife, who was delivering their third child. TT at 77:13-78:3.

him in late 2018 that Abdelhadi had been killed.  TT at 24:1-3; *see also* Transcript II at 13 (same).  The Court finds it difficult to believe that if his parents knew Abdelhadi had been killed and told Petitioner, that his parents either did not know that Moussa had been killed, or if they did, that they did not tell Petitioner.

### D.   Failure to Establish Good Moral Character Pursuant to 8 C.F.R. § 316.10(a)(2)

"An applicant who has committed or admits the commission of two or more crimes involving ***moral turpitude*** during the [five year] statutory period is precluded from establishing good moral character, even though the conviction record of one such offense has been expunged." 8 C.F.R. § 316.10(c)(3)(ii) (emphasis added).  Here, Petitioner's felony convictions do not preclude the Court from finding good moral character.  The crimes fall outside the statutory period because they took place in 2006 and 2007, over eight years before Petitioner filed his Application for Naturalization on November 27, 2015.  *See* Compl. at 5, ¶ 11, 11, ¶ 36.   However, both USCIS and the Court are "not limited to reviewing the applicant's ***conduct*** during the five years immediately preceding the filing of the application." 8 C.F.R. § 316.10(a)(2) (emphasis added); *see also* 8 U.S.C. § 1427(e).  Courts may consider "conduct and acts at any time prior to that period, if the conduct of the applicant during the statutory period does not reflect that there has been reform of character from an earlier period or if the earlier conduct and acts appear relevant to a determination of the applicant's present moral character." *Id.*; *see also* 8 U.S.C. § 1427(e).

The USCIS Decision raised Petitioner's two felony convictions, while acknowledging they fall outside the five-year statutory period, but arguing their relevance because Petitioner made false statements during his naturalization interview, and at least one of his criminal convictions "involved deception," a that deception is "a common theme shared" between his convictions and the instant conduct.  Decision at 101-02.  Respondent argues Petitioner does not acknowledge the seriousness of his expunged felonies, fails to admit responsibility, and fails to express any regret for his criminal conduct.  RFFCL at

-64-

23:15-23.   USCIS aptly notes that "[a]fter hearing Petitioner's description of what happened, one is left with the impression that the criminal charges, including the ones to which he plead guilty, were based on a misunderstanding and not based on blameworthy conduct." *Id.* at 23:23-26.

Petitioner's two previous convictions for using personal identifying information, *see* CAL. PEN. CODE § 530.5(a), and grand theft, *see id.* at § 484/487(a), are not within the relevant statutory period and do not disqualify him from citizenship on that basis.  8 C.F.R. § 316.10(c)(3)(ii).   However, the conduct underlying the convictions is relevant to this Court's determination.   Both convictions arose from deceitful and dishonest conduct, such as using someone else's information as his own or not promptly providing a refund for a customer who never received goods.   This is the same conduct (*i.e.*, dishonesty) that relates to Petitioner's intentionally false testimony at the hearing.

While the fact of Petitioner's previous convictions in and of themselves does not prevent the Court from finding Petitioner has good moral character under 8 U.S.C. §§ 1101(f), 1427(a), 1427(e), the fact that the conduct underlying those convictions is consistent with his intentionally false testimony at the hearing and demonstrates a lack of reform, which does demonstrate that he lacks good moral character.

## V.   **CONCLUSION**

For the above reasons, the Court **ORDERS** as follows:

1.      Petitioner's Application for Naturalization is **DENIED**, and the Clerk of the Court is directed to enter judgment in Respondent's favor and against Petitioner.   ECF No. 1.   This denial is *without prejudice* to Petitioner re-applying at a later date.   The Court notes that Petitioner is currently a lawful permanent resident of the U.S.   "The term 'lawfully admitted for permanent residence' means the status of having been lawfully accorded the privilege of *residing permanently* in the United States as an immigrant in accordance with the immigration laws, such status not having changed."   8 U.S.C. § 1101(20) (emphasis added).   While lawful permanent residents must reapply for replacement I-551 cards as those cards expire every ten years, that "expiration date has no bearing on the individual's

continued permanent residence, but rather only affects the validity of the card." Austin T. Fragomen, Jr., Careen Shannon, Daniel Montalvo, Immigr. Proc. Handbook § 21:9 (November 2021 Update).   Thus, this denial does not mean removal or deportation proceedings would be initiated against Petitioner:

> A naturalization proceeding is also fundamentally different from a removal proceeding.  If a naturalization application is denied by a hearing officer, LPRs are not threatened with removal or required to voluntarily surrender to immigration authorities to obtain judicial review.  They maintain permanent resident status, and again may apply for naturalization.

*De Dandrade v. United States Dep't of Homeland Sec.*, 367 F. Supp. 3d 174, 185 (S.D.N.Y. 2019), *aff'd sub nom. Moya v. United States Dep't of Homeland Sec.*, 975 F.3d 120 (2d Cir. 2020); *see also TT* at 5:5-15.   Given this Court's finding that Petitioner did not knowingly fund terrorism or condone his brothers' decisions to join a terrorist organization, it does not believe initiating removal proceedings against Petitioner would be appropriate, especially given Petitioner's wife and three children reside here with him in the U.S. However, initiation of removal and deportation proceedings as well as the discretion to waive such proceedings falls under the Attorney General's jurisdiction.  *See* 8 U.S.C. §§ 1182, 1229, 1229a. Thus, the Court makes no express ruling on that matter.

2.     Petitioner's Request for Judicial Notice is **DENIED-IN-PART** and **GRANTED-IN-PART**.  ECF No. 18

3.     Respondent's Request for Judicial Notice is **DENIED-IN-PART** and **GRANTED-IN-PART**.  ECF No. 22

4.     Petitioner's Unopposed Motion to Extend the Deadline for Submission of the Parties' Proposed Findings of Fact and Conclusions of Law is **DENIED**.  ECF No. 28.

5.     After the entry of judgment, the Clerk is directed to terminate any pending motions and deadlines and close this case.

**IT IS SO ORDERED.**

DATED:     January 14, 2022

**HON. ROGER T. BENITEZ**
United States District Judge

3:20-cv-02159-BEN-AHG